(No. 25658.—

WILBUR CLARK, Appellee, *vs.* JOHN QUICK, Appellant.

*Opinion filed September 15, 1941.*

SMITH, J., dissenting.

SCHOLFIELD & PURDUNN, GRENDEL F. BENNETT, CAS-LON K. BENNETT, and EVERETT L. DALBEY, for appellant.

ROBERT F. COTTON, and HAROLD E. NIMZ, for appellee.

Mr. JUSTICE SHAW delivered the opinion of the court:

At the election which was held November 8, 1938, in Clark county, Wilbur Clark was the Republican candidate for county clerk and John Quick was his opponent on the Democratic ticket. Quick was declared elected and from that election the contest developed from which this appeal

has followed. The canvassing board gave Quick 4787 votes and Clark 4770. On trial of the election contest the circuit court found that Clark had won over Quick by a majority of 12.0064. Every conceivable error and cross-error has been assigned, based on an enormous record—nearly 300 exhibits and over 400 pages of brief and argument. In order to confine this opinion to any reasonable length, it will be necessary to consider the questions raised by groups and the qualifications of the various voters individually, regardless of the point questioned, and finally to tabulate the results arrived at.

In order to summarize the questions of law which must be considered, we wish to point out at the beginning of this opinion that in recent cases, *Pope* v. *Board of Election Comrs.* 370 Ill. 196, *Park* v. *Hood,* 374 id. 36, and *Coffey* v. *Board of Election Comrs.* 375 id. 385, we have given careful consideration to a review of all our previous cases concerning matters of residence and qualifications to vote. These three cases have occupied much of our time, have been fully considered, and each of them, after long discussion and full argument, has been adopted. We consider those cases to state the law of this State on the points involved, and we will, therefore, refrain from further consideration or discussion of prior cases, many of which are cited in the briefs.

In the *Pope case* we endeavored to make it clear that there is a distinction between place of residence and domicile and that, although it may be true that a person retains one domicile until he acquires another one, it does not necessarily follow that his residence or place of abode coincides with his domicile. In that case we decided that residence for voting purposes means an actual place of abode and we pointed out that domicile and residence are not synonymous. In the *Park case* we reiterated our holdings in the *Pope case* and held that the term "residence" as used in the election law is equivalent to "permanent abode." In that case we

said: "A real and not an imaginary abode, occupied as his home or dwelling, is essential to satisfy the legal requirements as to the residence of a voter. One does not lose a residence by temporary removal with the intention to return, or even with a conditional intention of acquiring a new residence, but when one abandons his home and takes up his residence in another county or election district, he loses his privilege of voting in the district from which he moved." These two holdings were reaffirmed in the *Coffey case, supra,* and the holdings of these cases are the basis for decision in this one.

Another preliminary observation will dispose of considerable argument in the briefs. A great deal is said on both sides concerning the right of every voter to express his will at the polls and it is clearly inferable from the arguments that this is considered to be an absolute right. It is enough to point out that it is not an absolute, but a conditional right. It is conditional, in some cities, upon previous registration; it is conditional upon not moving from one precinct to another within thirty days; it is conditional upon reaching the polling place while the polls are open, even though failure to do so might be entirely without fault on the part of the voter, and it is conditional in the case of absent voters, on the proper application being made within the proper time and in accordance with the statute. The right to vote is conditional upon many other things which might be mentioned and upon circumstances which may or may not appear to be within the control of the voter. No good purpose can be served by discussing any of the bad results which might follow from a failure to meet the conditions. No one doubts the legislative power to prescribe reasonable conditions and any fault which may be found with them must be taken up with the legislative rather than the judicial branch of government.

It is one of these conditions that raises the first serious point of argument which concerns the validity of forty-six

absent voter's ballots. The statute which controls the voting by absent electors is quite specific in its directions as to how such ballots shall be applied for, how they shall be voted and how they shall be returned. The subject is covered by the Absent Voters act. (Ill. Rev. Stat. 1939, chap. 46, pars. 462-475.) It is provided by this act that an elector who expects to be absent from his place of residence on election day may apply to the proper official within the times mentioned in the statute for an absent voter's ballot and that he may receive the same to be used by him as in the act specified. So far as material here the pertinent section is section 6 (par. 467) of the act, which is as follows: "Such absent voter shall make and subscribe to the affidavits provided for in the application and on the return envelope for said ballot before an officer authorized by law to administer oaths and such voter shall exhibit the ballot to such officer unmarked, and shall thereupon in the presence of such officer and of no other person mark such ballot or ballots, but in such manner that such officer cannot see or know how such ballot is marked, and such ballot or ballots shall then in the presence of such officer be refolded by such voter in the manner required to be folded before depositing the same in the ballot box, and be in the presence of such officer deposited in such envelope and the envelope securely sealed. Such officer shall then endorse his certificate upon the back of said envelope and said envelope shall be mailed by such voter, postage prepaid, to the officer issuing the ballot or, if more convenient, it may be delivered in person, but in any event it must be returned into the hands of the officer in sufficient time for said ballot or ballots to be delivered by such officer to the proper polling place before the closing of the polls, on the day of the election."

A subsequent paragraph of the act provides severe penalties for any willful violation of its provisions including

fines up to $2000, imprisonment up to one year and disfranchisement up to five years, with a forfeiture of any right to hold any elective or appointive office in this State.

It will not be necessary to go into detail as to each of the 46 absentee ballots because they all fall into one group and all are necessarily subject to the same rules. Neither is there any serious question but that they were all Republican ballots and all handled in substantially the same way. These ballots were obtained on affidavits taken before an active officer of the party with the assistance of a sister of the plaintiff who was a stenographer. Instead of being returned by mail to the county clerk as required by the statute, these ballots were given to John Hollenbeck, who was secretary and treasurer of the Republican county organization in Clark county, who testified he placed some additional tape on the envelopes, including some which had been left for him at the office of the *Marshall Herald* and some which had been left at the office of his father. He held part of these ballots until November 6, 1938, and some until the morning of election day, November 8, 1938, when they were mailed or delivered to the county clerk. In the meantime those ballots which he held he said were kept in a safe in his office to which a sister of the plaintiff had access and which safe was not always kept locked. These ballots were received by him at various times and he said he put the extra tape on them for fear the country clerk or someone else might tamper with them. He received and held absent voter's ballots from various other Republican workers, some of which were voted in the *Herald* office and others in other places. Hollenbeck is State's attorney of Clark county, elected on the Republican ticket and precinct committeeman for precinct No. 2 in Clark county. Some other precinct committeemen had control of these absent voter's ballots, none of which were mailed within the statutory provision and some of which were held as long as

ten days and probably, as to many of them, for a much longer period. Many of these ballots were notarized by the plaintiff's sister and then kept by her for future handling.

These ballots were void. There is nothing in the record before us to indicate that any of them were actually tampered with by any unauthorized person, but it is entirely obvious that the opportunity to do so was present. It is the entire theory of our ballot law, as expressed in all of the cases, that once a ballot has been marked by a voter in secret, from that time on it shall not be subject to any opportunity for any other person to mar, change or erase it. It will be found in all of the cases that the question for consideration by the court is not whether the ballot has been tampered with, but whether or not an unauthorized person has had an opportunity to do so. If the opportunity has been present the presumption seems to follow that it has been used.

It is urged that the provisions of the Absent Voters law requiring the voter to mail the envelope containing his ballot is directory only and not mandatory; that he may substitute an agent to perform this duty for him and that in such event no harm has been done. These arguments are not in accord with the spirit and intent of our election law. Our system requires not only that the ballot must be secret, but that the voter himself must be given no opportunity to satisfy some other person how he has voted. (*Gill* v. *Shurtleff,* 183 Ill. 440.) Thus, a ballot voted outside the booth is void. (*Rhyan* v. *Johnson,* 364 Ill. 35.) Where the terms of a statute are peremptory and exclusive, where no discretion is reposed or where penalties are provided for its violation, the provisions of the act must be regarded as mandatory. *Behrensmeyer* v. *Kreitz,* 135 Ill. 591; *Perkins* v. *Bertrand,* 192 id. 58; *Gill* v. *Shurtleff, supra; Siedschlag* v. *May,* 363 Ill. 538; *Waters* v. *Heaton,* 364 id. 150; *People* v. *Bushu,* 288 id. 277; *Allen* v. *Fuller,* 332 id. 304.

It is the clear intention of the Absent Voters law' that the legislature was willing and intended to commit the tem-

porary custody of a ballot to the United States mails for delivery to the proper officials. It is equally clear that there was no intention that such custody should be committed, even temporarily, to any other person or agency. It has been suggested that an absent voter might be in the hospital where it would be impossible for him personally to mail his ballot. The existence of such a circumstance, although it might deprive a voter of his ballot, would only be one of those unfortunate events which we mentioned at the beginning of this opinion, as being one of the things which might deprive a person of his vote. As we said above, the right to vote is conditional upon compliance with the reasonable rules for the exercise of the franchise.

It is conceded that these 46 absent voters' ballots were all Republican. Three of them, however, were ruled out by the trial court on grounds of residence, so the net result of our holding as respects them is a net loss of 43 votes for the Republican candidate.

In the trial of this case more than 4000 pages of testimony were taken, several hundred exhibits, several hundred pages of depositions were offered and rejected. The rejection of these depositions by the trial court is one of the errors discussed in the briefs. Since we do not feel that this ruling could have affected the result of the case, it will be unnecessary to discuss that matter. Neither will it be necessary to consider or discuss any of the court's rulings as to party affiliations. In each case his holding is sustained by evidence and supported by the record. We take the same view as to the findings of fact made by the trial court on disputed questions of residence. No case is pointed out in which there has been any arbitrary finding of fact not sustained by some competent evidence and since the trial judge saw and heard the witnesses, observed the conduct of the parties, their attorneys and their witnesses at the trial, was fully informed as to which party was calling the witness or was objecting to his testimony, and personally knew all of those shadings, conduct and demeanor

which are familiar to every trial lawyer and trial judge, we feel that he was in a much better position than we are, to pass on these questions of fact. Furthermore, we have observed from this record that the circuit judge conducted the trial with great fairness and much patience. We have, therefore, adopted in its entirety his findings of fact, differing with him only in certain interpretations of those facts within our decisions which we have above referred to.

Before considering those few cases in which we find it necessary to disagree with the trial court's interpretation of the facts it is necessary to note that certain questions are raised by cross-error which apparently were not submitted to the trial judge. It appears from his findings that bills of particular were furnished by each side to the other but that briefs were submitted to him only as to 166 voters. The trial judge passed on the 166 voters and we do not think that in this state of the record it would be proper for us to review the evidence as to any of the others. In any event, there are not enough of them to affect the result if every claim made were to be sustained. Neither would it affect the result of this case if we were to review the evidence as to the party affiliations as to which the trial court found that there was not enough evidence to make a determination of the question and which votes were pro-rated.

We will, therefore, proceed to a consideration of the facts and rulings in those few cases in which we find it necessary to disagree with the rulings of the trial court. Of these cases there are 12 Democratic ballots which we believe were improperly counted for the Democratic candidate and 5 Republican ballots which we believe were improperly counted for the Republican candidate. Since neither the briefs of either party nor the abstract of record have arranged these voters in any alphabetical or other logical sequence, we will have to refer to them by name

and the number arbitrarily given to them in the trial court's findings of fact.

MANFORD ROBINSON–SADIE ROBINSON, Wabash precinct 2. (3-4). This husband and wife testified to their intention to hold residence in Wabash 2 and have voted in that precinct for many years. The father of the husband was 96 years old and had owned a farm in Wabash 2 which he had deeded to his son in 1938. However, the parties had lived in Terre Haute, Indiana, for nearly five years before the election and had been receiving relief in Terre Haute. There is nothing to indicate that these parties have a permanent place of abode in Wabash 2 even though they did own some property there. We feel that the trial court erred in holding them to be legal voters and that two votes should be deducted from the Democratic candidate.

CLEMMIE FARRIS, Marshall precinct 3. (7). This voter was apparently separated from her husband and was living in Terre Haute where she had made affidavit that she was a citizen of Indiana on application to become registered as a voter in that State and had become so registered. Her husband was living in Marshall 3 and the court held that his residence fixed hers and held her to be a legal voter. We think in this that the court erred, confusing a question of domicile with one of residence for voting purposes. The vote is illegal and should be deducted from those counted for the Democratic candidate.

ERNEST PINE–LULU PINE, Marshall 1. (33-34). This husband and wife voted in precinct 1, Marshall township, although they admittedly lived in precinct 2. The husband is superintendent of the waterworks in Marshall and until three or four months prior to the election had lived in precinct 1 but at that time had moved to a home in precinct 2. In passing on these two votes the court said, "I have not been able to find any authority for the proposition that one who works for a city, as Ernest Pine, comes under

the same classification as the constitutional provision, providing that employees of the State and Federal government do not lose their voting residence, but because the court is holding that the Republican, Judge Booth, and other Republican employees of the Treasury Department did not lose their voting rights in Marshall county, the court feels that the same reason, under the peculiar fact of Ernest Pine's employment, ought to apply to him and his wife." We think that in this the court was being over-anxious to be fair. Obviously the same reason does not apply to a simple municipal employee, such as this voter was, as applies to State and Federal employees under the constitution. These two Democratic votes were illegal and should have been deducted from those counted for the Democratic candidate.

MAYME T. LEE, Parker township. (36). This voter had once lived in Parker township where she owned a farm left by her husband who died in 1936. However, long prior to the election she had moved to Westfield township where she owns her home. The mere fact that she owned property in Parker township which she might claim as her home at some time if she so desired did not qualify her as a voter in that township. The vote was illegal, was Democratic, and should be deducted from those counted for the Democratic candidate.

JOE TURMAN–FRANCIS TURMAN, Marshall 3. (37-38). This case is not free from doubt but we are unable to agree with the trial court that this man and his wife had a home or permanent place of abode in Marshall precinct 2. He moved to Peru, Indiana, five or six years prior to election, and prior thereto had lived in precinct 2. When he moved to Indiana he left some household goods with his father in precinct 3, from which he voted. He testified that if he lost his job in Peru he would return to Marshall, but he also testified that on November 8, 1938, his home was in Peru. We have concluded that these two votes are illegal and

should be deducted from those counted for the Democratic candidate.

ALEX STILLWELL–PRISCILLA STILLWELL, Martinsville 1. (43-43A). In this case the trial court stated that he considered the question rather close and the evidence not very satisfactory but that he thought it a fair inference that they could have claimed the home of Mr. Turner, who was related to Mrs. Stillwell, as a place of abode and that he found that it was their intention to claim Martinsville 1 as their voting residence. There was, however, no satisfactory evidence that they had any definite place of abode in Martinsville 1 and it was quite clear that they had been living at Terre Haute, Indiana, for about two years before the election. We think these two Democratic votes were illegal and should be deducted from those counted for the Democratic candidate.

FRANK McDANIEL–PEARL McDANIEL, Marshall 1. (70-71). The only evidence to sustain these challenged votes is that Frank McDaniel's mother was an heir to a place in the north part of Marshall 1 and that he regarded this place as his home. There is no evidence at all that he ever lived there, at or near the time of election, and evidence to the contrary that neither he nor his wife lived in that precinct. These two votes were illegal and should be deducted from those counted for the Democratic candidate.

ROBERT CUSTER, Anderson township. (129). This voter was a wandering farm hand who died after election leaving no relatives. One witness testified that Custer had been staying at his house but had left in September, nearly two months before the election and had not been there since. He did leave clothes at this witness' house and came back late in the fall, apparently after the election, and got them. There is nothing to indicate that the house of this witness, any more than the house of any other farmer where the voter might have temporarily resided, could be regarded as his permanent place of abode or that he had

any abode for voting purposes. The vote is illegal and should be deducted from those counted for the Republican candidate.

J. B. PENDELL–DOROTHY PENDELL, Westfield township. (130-131). No review as to these voters is necessary as appellee concedes in his brief on page 33 that the votes were illegal under our holding in the *Coffey case, supra,* and that they should be deducted from those counted for the Republican candidate.

LESTER NOYES, Martinsville 2. (143). This voter had been divorced about five years before the election and during that time had moved around from place to place working at Martinsville, Terre Haute, Carlyle, Farmersburg and Vincennes—wherever he happened to have a job. He had an interest in a farm in Martinsville 2 which was leased to one Clifford Lowry and he testified that he had an arrangement with Lowry that he could come and stay there any time he wanted to. At the time of the divorce his wife got all the furniture and there is nothing in the record to indicate that he had any place of abode whatever. We think the court erred in holding him to be a legal voter, and that his vote should be deducted from those counted for the Republican candidate.

As above indicated there were four illegal votes found by the trial court which were apportioned .5008 to Quick and .4992 to Clark. These fractions are so near 50-50 that it is apparent it could make no difference in the result and the fractions may therefore be disregarded. Without these long decimals the final results found by the circuit court gave John Quick 4730 votes and Wilbur Clark 4742 votes, or a majority of 12 for Clark. Summarizing our findings in the foregoing opinion we have arrived at the following result: We have found the 46 absent voters' ballots to be illegal. Three of these however, were thrown out by the trial judge on questions of residence so the net loss to the Republican candidate because of this holding is 43 votes.

In addition to these 43 votes, we have differed with the trial judge as to 5 Republican votes making a total loss to the Republican candidate of 48 votes. On the other hand we have differed with the trial judge as to 12 Democratic votes making a net loss to the Democratic candidate of 12 votes. It is, therefore, our conclusion that John Quick received 4718 legal votes and that Wilbur Clark received 4694 legal votes and that John Quick was the winner in the election and should be so declared. It is, therefore, the judgment of this court that the judgment of the circuit court of Clark county be reversed and the cause remanded to that court, with directions to enter a judgment in accordance herewith.

*Reversed and remanded, with directions.*

Mr. JUSTICE SMITH, dissenting:

I am unable to agree with the majority opinion in so far as it holds that 43 of the 46 absent voters' ballots were illegal. The far reaching effect of the opinion, and its importance to the general public, impels me to state the grounds of my dissent. Three of the 46 absentee ballots were cast by persons found not to be legal voters. This leaves only 43 to be considered.

The majority opinion holds that the applicable provision of the Absent Voters act is mandatory and a failure of the voter to comply with that provision renders the ballot illegal, solely because it is mandatory.

Section 6 of the Absent Voters act (Ill. Rev. Stat. 1939, chap. 46, par. 467) provides that the ballot, after it has been marked and sealed by the voter, shall be mailed by him, postage prepaid, to the officer by whom it was issued. There is no declaration in the statute that conformity with this provision is essential to the validity of the ballot so voted. The holding of the majority opinion that this provision is mandatory is not based on the ground that con-

formity therewith is essential to the validity of the ballot, but solely on the ground that it is held to be peremptory in form and that a penalty is provided for its violation. Laying aside for the moment any question as to whether this particular provision of the statute is directory or mandatory, which, according to my view, is wholly immaterial, as I read the statute, no penalty is provided to be imposed upon a voter who merely fails to return his ballot to the officer by whom the same was issued, strictly in the manner provided in section 6 of the act. The penalties provided by the act are found in section 13. (Ill. Rev. Stat. 1939, chap. 46, par. 474.) That section provides *inter alia:* "If any person who having procured an official ballot or ballots as heretofore provided, shall wilfully neglect or refuse to cast or return same in the manner heretofore provided, or shall wilfully violate any provision of this act, he shall be guilty of a misdemeanor," etc.

This section does not impose a penalty upon an elector for his mere failure to return his ballot in the manner, or by the agency, provided in the act. The penalties are imposed only upon the elector who *"wilfully"* neglects or refuses to do so. The word *"wilfully,"* when used in connection with a penal statute, has a definite, fixed and accepted meaning. It means not merely a voluntary act, knowingly done, but an act committed with an evil intent. *Odin Coal Co.* v. *Denman,* 185 Ill. 413.

In 68 Corpus Juris, p. 290, section 4, it is said that the word "wilfully," when used in connection with a criminal or penal provision of a statute, has an accepted and restricted meaning and denotes an evil or criminal design and intent. In support of that definition, literally hundreds of cases are cited from practically every State in the Union, together with decisions of the Federal courts, textbooks and law dictionaries. Under this universal rule the voter who violates the letter of section 6 of the Absent Voters act by permitting someone else to actually deposit his ballot

in the mails, instead of mailing it personally himself, is not subject to a penalty under section 13 of the act, unless such act on his part is for an unlawful purpose and is accompanied by an evil or criminal intent. With this analysis of the penal section of the act, the whole basis on which the majority opinion is grounded disappears.

There is here no claim by anyone that either of the 43 absent voters, in authorizing someone else to deposit his ballot in the mails, was actuated other than from the most lawful and laudable purposes. His sole purpose was not to violate the law or to perpetrate a fraud, but to insure compliance with the law and to prevent the recurrence of acts which he believed had theretofore occurred in his county, in connection with prior elections. Under the facts shown here, no one would contend that he committed any crime or did, or omitted to do, any act for an unlawful purpose or with an evil or criminal intent. He did nothing which would subject him to a penalty under any reasonable construction of the act. No one of the 43 voters here involved committed any act which would subject him to the penalties of section 13. This statutory provision cannot, therefore, be held to be mandatory because a penalty is provided for any omission charged against the 43 voters here involved. There is no such penalty provided in the entire act.

As I view it, the requirement of the statute that the voter shall mail his ballot is purely directory. The failure to comply with the letter of the statute may, or may not, render the ballot illegal, depending on whether or not such failure affects the result of the election. It is not, and cannot be, contended in this case that the result of the election would have been any different had each of the 43 absent voters personally mailed his ballot, or delivered it personally, to the clerk, in strict compliance with the letter of the statute. Indeed, the only purpose here is to change the result of the election by invalidating the ballots and

disregarding them in arriving at the result. The result of the contentions here made, if sustained, would not be to purge the election of fraud or fraudulent votes, but, by construction, to create a fraud by which legal voters will be disfranchised and the will of the majority expressed in the election defeated and set aside. A salutary provision of the statute designed to prevent fraud would be converted into a vehicle of fraud. It is not only conceded but proved by appellant, and stipulated by appellee, that all of the 43 ballots in question were voted for appellee. The majority opinion expressly so finds. It is also established, and not controverted, that no one of these ballots had been opened, changed, or tampered with. They were still sealed as the voter sealed them. It is clearly shown, and not disputed, that they reached the hands of the judges on the day of the election in exactly the same condition they were in when they were marked by the voters and by them sealed in the envelopes in which they were delivered to the judges of the election.

It should be remembered that there was no re-count of the ballots. The returns of the election officials were accepted as correct by all parties. Each of the parties relied upon his ability to show that illegal ballots were cast and counted for his opponent. No effort was made to impeach the official returns except to deduct therefrom alleged illegal votes. In this situation appellant undertook to show that as to the 43 absentee ballots counted for appellee, the voters did not mail the ballots personally to the clerk and nothing more. The record shows that each of the 43 voters involved was a legal voter and was entitled to an absentee ballot; that he made proper application therefor; that the ballot was issued to him; that he complied with every provision of the statute by marking his ballot in the presence of an officer authorized to administer oaths, and that he then, in the presence of such officer, sealed his ballot in the envelope provided for its return, strictly in the manner pro-

vided by statute. Up to this point there is no contention that every act taken in connection with each of the ballots involved was not strictly legal and in conformity with both the letter and spirit of the statute. When the ballots were sealed in the envelopes provided for their return, each of these voters departed from the strict letter of the statute and instead of the ballots being actually deposited in the mail by the voters themselves they were left with other legal voters, with instructions to preserve the ballots and to mail them to the officer by whom they were issued, as provided by statute. Their purpose in doing this is explained in the record by the testimony of many of the voters themselves and other witnesses. There had been rumors in connection with prior elections in the county that ballots had not always been preserved in the office of the county clerk with that degree of strictness required by statute. This is not necessarily a reflection on the county clerk. Anyone who has practiced law in rural counties for any considerable period of years, and who has been engaged in election contest cases, knows that generally the office of the county clerk in which he conducts his business has neither the space nor the equipment to enable him to preserve ballots in the manner required by statute. Both before and after the election they are kept in such places as are available and not then in use for other purposes. The rumors current in Clark county were no different from the rumors and facts existing in many other like counties. These 43 voters, for the sole purpose of insuring a compliance with the law that their ballots might be properly preserved and their right of suffrage be not denied, failed to follow the strict letter of the statute but adopted what they honestly believed to be a safer method for the return of their ballots. They left them with an agent whom they trusted, to be, by him, mailed in time to reach the office of the county clerk so that they could be delivered to the judges of election on the day of the election. As a further

precaution that the ballots should not be tampered with, transparent adhesive tape was placed over the sealed flap of each envelop in order that the envelopes could not be opened without detection. It cannot be said, as I view it, that this conduct on the part of the 43 voters involved was accompanied by any evil or criminal intent, or with any purpose to violate the statute. It certainly would not subject them to the penalties provided therein. On the contrary, it is established beyond question that they were moved only by a desire to prevent a violation of the law and only had the most laudable and commendable purposes in mind. Their ballots reached the judges of election in the various precincts in exactly the same condition they were in when they left the hands of the voters. Whether the ballots were mailed by the voters themselves, or by their designated agent, had no effect whatever on the result of the election. Neither can it be said that anything they did in any way violated the secrecy of the ballot. Their ballots went into the ballot boxes inviolate and untampered with. They were counted exactly as they were marked and cast.

Whether the statutory provision involved was "mandatory" or "directory" is a matter of no importance. As this court well said, in *Siedschlag* v. *May,* 363 Ill. 538, strictly speaking all provisions of the election laws are mandatory in the sense that they impose the duty of obedience on those who come within their purview, but it does not therefore follow that every slight departure therefrom should taint the whole proceedings with a fatal blemish.

The question here is not whether the statutory provision in question is mandatory or directory, but is: Did the failure to comply with the letter of that provision affect the result of the election? It has been the trend of the decisions of this court for many years in election contest cases to discard technical and outmoded rules and to determine by logical and reasonable processes the result of an election. It has been held in many cases that the failure

to observe some provision of the statute which does not in any way affect the result of the election will not be considered as invalidating the election or the ballots cast therein. This rule was particularly applied in the late case of *Talbott* v. *Thompson*, 350 Ill. 86. There the ballots had not been preserved in the manner provided by statute. No one would contend that the provision of the statute for the preservation of the ballots was not equally as mandatory as the provision of the statute here involved. For a violation of that provision a definite penalty is provided. In that case the ballots were kept in an unlocked room ·or vault to which the public had access at all times during business hours. The court found that there was reasonable opportunity for interference with the ballots by unauthorized persons. The court rejected the ballots in the eight bags which were found open; however, as to all the bags on which the seals had not been broken the ballots contained therein were held to be legal ballots and considered and counted by the court. The rule followed was that even though the statute had been violated in regard to the preservation of the ballots, and the ballots had been exposed and an opportunity given to unauthorized persons to tamper with the same, nevertheless, as to the bags on which the seals were intact this was conclusive proof that the ballots had not been tampered with and that they should be considered and counted, and that their probative force as evidence was sufficient to overcome the official returns of the judges of election. Under this rule, even where the law has not been followed, if it appears that the result of the election has not been affected and would have been no different had the law been strictly observed, such violations or omissions will be regarded as mere irregularities not affecting the result.

This rule particularly applies in this case, as I view it. Here, there is no claim that what these voters failed to do, in compliance with the strict letter of the statute, resulted

in destroying the secrecy of the ballot or changed the result of the election. Any attempt, therefore, to distinguish between mandatory and directory provisions of the statute is a mere technical distinction which has not been followed by this court, and places an unwarranted emphasis on an unimportant provision of the statute.

In the case of *Siedschlag* v. *May, supra,* this is clearly demonstrated. In that case seven absent voters' ballots were involved. It was proved and found by this court that these ballots were never deposited in the ballot box. There was also a question there raised as to whether the ballots were initialed by a judge of election. It has been held in many cases that the provision of the statute requiring a judge of election to initial the ballots is mandatory and without such endorsement the ballots cannot be counted. It was also held in *Siedschlag* v. *May, supra,* that the failure of the judges to deposit the ballots in the ballot box was the violation of a provision which was directory only and did not affect the validity of the ballots, notwithstanding the provision requiring the ballots to be initialed by a judge of election and the provision requiring them to be deposited in the ballot box, are found, not only in the same section of the statute, but in the same sentence of that section, (Ill. Rev. Stat. 1939, chap. 46, par. 470,) and notwithstanding the same penalty is provided for their violation. Ill. Rev. Stat. 1939, chap. 46, par. 474.

In the above case the court quoted with approval from the case of *Jones* v. *State,* 153 Ind. 440, as follows: "All provisions of the election law are mandatory if enforcement is sought before election in a direct proceeding for that purpose, but after election all should be held directory, only, in support of the result, unless of a character to affect an obstruction to the free and intelligent casting of the votes or to the ascertainment of the result, or unless the provisions affect an essential element of the election, or

unless it is expressly declared by the statute that the particular act is essential to the validity of an election or that its omission shall render it void."

As I view it, the rule deducible from all the decisions is that the effect on the legality of a ballot, or an election, of an omission to strictly observe a provision of the statute, cannot be determined by any attempt to classify the provisions as "mandatory" or "directory," by any technical or conventional rule.

The purpose of an election is to ascertain the will of a majority of those entitled to vote in such manner as to preserve the free expression of the voter and at the same time protect the secrecy of the ballot. Any failure to follow the strict letter of the statute, either on the part of the voter or election officials, which does not affect such free expression or destroy the secrecy of the ballot, and which does not alter or change the result, should not be held to invalidate either the election or ballots cast therein. This is the rule announced in *Siedschlag* v. *May, supra.*

In the cases of *Laird* v. *Williams,* 281 Ill. 233, *McNabb* v. *Hamilton,* 349 id. 209, and *Blattner* v. *Deitz,* 311 id. 445, it was held that ballots endorsed by one judge with the initials of another could not be counted. Nearly twenty year later, in the case of *Waters* v. *Heaton,* 364 Ill. 150, those cases were expressly overruled. This court refused to follow the rule of those cases further. In that case, speaking with reference to the peremptory requirements of the statute that one of the judges of election "shall endorse his initials" on each ballot, it was said: "The section of the statute as to the initialing of ballots contains no words stating that votes shall not be counted if they are not initialed in strict conformity with the statute. In the absence of proof of fraud or other improper conduct which would affect the result of the election, the statutory provisions, and the section itself, should be held to be directory

and not mandatory, and this in spite of the fact that we have held ballots initialed by one judge with the initials of another to be illegal and therefore void in many cases."

In *Hodge* v. *Linn,* 100 Ill. 397, it was said that any irregularity not proceeding from any wrongful intent and which deprived no legal voter of his vote, and which did not change the result, will not invalidate the election or the ballots cast. This holding was cited and approved in *Behrensmeyer* v. *Kreitz,* 135 Ill. 591. In *People* v. *Graham,* 267 Ill. 426, it was held that the failure to provide necessary polling places, as required by the peremptory provisions of the statute, was a mere irregularity which did not affect the result. In *Talbott* v. *Thompson, supra,* it was held that ballots which had not been properly preserved, but which had been exposed to unauthorized persons with ample opportunity to tamper with them, where it was shown they had not in fact been tampered with, were properly counted because the irregularity did not affect the result. Many other cases in which like holdings are found might be cited. Certainly the irregularities in each of those cases were violations of statutory provisions equally peremptory and mandatory as the requirement in section 6 that the voter shall personally mail his ballot after it is marked and sealed by him. In none of the cited cases was the proof any more conclusive that the irregularity did not affect the result.

The construction placed on this statutory provision by the majority opinion disfranchises the 43 legal voters involved in this case, notwithstanding their ballots were properly and legally marked and sealed by them, and which ballots, it is conceded, were preserved and delivered to the judges of election in the same condition they were in when they left the voters' hands. Moreover, it will hereafter disfranchise every elector unavoidably absent from his precinct who is confined in a hospital or for any cause is unable to go to a post-office or mailbox and deposit his absent voter's ballot in person.

In my opinion, if the legislature contemplated a construction which would lead to such absurd consequences it would have found more appropriate language in which to express its intention, and would have definitely provided that the failure of the voter to personally mail his ballot would invalidate his vote.

Giving to appellee the 43 votes cast for him by the absentee ballots, to which, in my opinion, he was clearly entitled, he was elected by a majority of 19 votes.