GEORGE H. HUBER, Petitioner-Appellant, *v.* JOHN C. REZNICK, Respondent-Appellee.

Fifth District   No. 81-180

Opinion filed June 11, 1982.

530

George H. Huber, of Vandalia, for appellant, *pro se*.

John C. Reznick, of Vandalia, for appellee, *pro se*.

JUSTICE JONES delivered the opinion of the court:

This appeal stems from an election contest action brought by appellant, George Huber (Huber), to contest the election of appellee, John

Reznick (Reznick), to the office of State's Attorney of Fayette County, Illinois.

Huber and Reznick were the Democratic and Republican candidates respectively for the office of State's Attorney in the general election held on November 4, 1980. Upon completion of the counting and canvassing of the votes in the 35 precincts of Fayette County, Reznick was declared to be the duly elected State's Attorney of Fayette County, as having received 4,920 votes to Huber's 4,888 votes. Discovery was instituted by Huber, and an unofficial recount of the votes in nine Fayette County precincts indicated a total vote of 4,907 for Reznick and 4,902 for Huber. Huber then filed an election contest petition, requesting an examination and recount of all ballots cast in the 35 precincts of Fayette County.

The court appointed a special canvassing board which reported that, with the exception of certain ballots set aside for determination by the court, there were 4,869 votes for Reznick and 4,870 votes for Huber. Ballots objected to by the board included those which were found not to be valid votes for either candidate, those which had been placed in envelopes for "spoiled" ballots, and unvoted absentee ballots. These ballots were put in separate envelopes according to precinct and presented to the court for a determination as to their validity in each instance.

The court heard arguments of counsel as to the ballots objected to at a hearing which began on January 30, 1981. After the ballots had been considered and ruled upon by the court, the canvassing board's total of 4,869 votes for Reznick was adjusted by 40 votes to a final total of 4,909, and the canvassing board's total of 4,870 votes for Huber was adjusted by 39 votes to a final total of 4,909. The court found that both Reznick and Huber had the "highest and an equal number of votes" for the office of State's Attorney of Fayette County and directed that the matter would be determined by lot pursuant to section 23—27 of the Election Code (Ill. Rev. Stat. 1979, ch. 46, par. 23—27).

At this stage in the proceedings the parties requested a continuance so that they might reach a settlement of the issues in the case. The trial court denied this request and advised counsel that they would be given a short period of time to select a method of settling the tie. When the parties failed to stipulate in this regard, the court directed the circuit clerk to flip a coin, and the coin flip was won by Reznick. The trial court declared Reznick to be the duly elected State's Attorney of Fayette County and entered judgment accordingly.

On appeal from this judgment, Huber challenges the rulings made by the trial court as to the validity or invalidity of various ballots, including three absentee ballots which Huber contends should have been opened and considered by the court. Huber also cites as error the court's refusal to grant a continuance to allow the parties time to settle the case and the

court's choice of a coin flip as the method used for determining the winner by lot.

We note initially that the parties have stipulated to the canvassing board's totals of 4,869 votes for Reznick and 4,870 votes for Huber. Moreover, no objection is made as to the court's ruling on a large number of the ballots questioned by the board. We are thus asked to consider only those ballots which were the subject of interpretation and decision by the trial court and which were not agreed upon by the parties. These ballots have been designated by the precinct number and the number of the particular ballot in that precinct and will be discussed individually in numerical order.

Ballot 3—3, the first ballot for consideration, was found to be a valid vote by the trial court, which ruled that the cross before Reznick's name properly intersects within the square. Huber argues that the cross occurs on the lower line of the square and the ballot should not be counted. The rule as set forth by the supreme court in *Tuthill v. Rendelman* (1944), 387 Ill. 321, 347-48, 56 N.E.2d 375, 389, is that "the intersection of the cross must fall within the area formed and bounded by the lines of the square" and a cross which intersects on the line does not constitute a valid vote. This is a factual question which this court can determine as well as the trial court by examining the ballot before us. (*Tuthill v. Rendelman.*) We find from our examination that the horizontal line rests atop the bottom line of the square and therefore must be considered to form a cross within the square. It was not error to count this ballot as a valid vote for Reznick.

■■ Ballot 8—1 contains a mark before Huber's name that consists of a generally horizontal line slanting down to the right and a diagonal line beginning in the upper left corner of the square. The lines meet at approximately a 45 degree angle but do not cross. The trial court ruled that the ballot was invalid for lack of a proper cross. Huber contends that although the lines do not cross they make a mark in the form of an inverted letter T, which has been held to be a cross. (*Parker v. Orr* (1895), 158 Ill. 609, 41 N.E. 1002; *Slenker v. Engel* (1911), 250 Ill. 499, 95 N.E. 618; *Tuthill v. Rendelman.*) The mark before Huber's name, however, is not a T. It more closely resembles a letter Y, and a Y is not a cross. (*Greene v. Bjorseth* (1932), 350 Ill. 469, 183 N.E. 464; *Boland v. City of LaSalle* (1938), 370 Ill. 387, 19 N.E.2d 177; *Scribner v. Sachs* (1960), 18 Ill. 2d 400, 164 N.E.2d 481.) The trial court correctly found this ballot to be invalid.

Ballot 9—11 is similar to ballot 3—3 in that it involves a question of fact as to whether the intersection of the two lines occurs within the square. Upon examination we find that the point of intersection is adjacent to but not on the line that forms the side of the square. This ballot was correctly counted as a valid vote for Reznick.

■■ Ballot 9—12 contains three large X's in the Republican party circle at

the top of the ballot. The lines are heavy parallel pencil markings that cross within the circle and extend outside it. Huber contends that these lines constitute distinguishing marks which render the ballot invalid as it is highly unlikely that any other voter would mark his ballot in a similar manner. In *Barlick v. Kunz* (1940), 375 Ill. 318, 323, 31 N.E.2d 283, 285, the supreme court set forth the applicable test for determining what constitutes a distinguishing mark:

> "Any deliberate marking of a ballot by a voter not made in an attempt to indicate his choice of candidates, which is also effective as a mark by which his ballot may be distinguished, should be considered as a distinguishing mark, invalidating the ballot. [Citation.] Conversely, if it appears that marks were placed upon a ballot as the result of an honest effort by the voter to indicate his choice of candidates and not as an attempt to indicate the identity of the voter, the ballot should not be rejected. [Citations.] Whether a particular mark upon a ballot is a distinguishing mark is largely a question of fact to be determined from an inspection of the original ballot. [Citations.]"

The markings on ballot 9—12 are all made in the Republican circle, and it does not appear that they were made for any reason other than to indicate the voter's choice of candidates. There is nothing about the manner or placement of the marks which manifests an attempt to indicate the voter's identity. For this reason, the trial court's finding that the multiple marks do not constitute a distinguishing mark or marks will be affirmed. See *Kerr v. Flewelling* (1908), 235 Ill. 326, 85 N.E. 624; *Greene v. Bjorseth*.

Ballot 14—2, like ballots 3—3 and 9—11, is objected to on the ground that the X before Reznick's name does not cross within the square. We agree with the trial court's ruling that it does intersect within the square as the vertical line extends beyond the horizontal line for a fraction of an inch within the square. Ballot 14—2 was correctly found to be a valid vote for Reznick.

Ballot 17—1 was held to be invalid as a vote for Huber because the lines in the square before his name do not intersect. We agree. An examination of the ballot reveals that the lines, which would otherwise form a V, do not touch and certainly do not cross. Huber's reliance on the court's language in *Tuthill v. Rendelman* that lines which came "into practical proximity with [each] other" were "close enough to warrant the conclusion that they touch" (387 Ill. 321, 345, 56 N.E.2d 388) is misplaced, as the court there found the resulting mark resembled a T which is a valid cross. Here, even if it could be said that the lines touch, they would form a V, which is not a cross. (*Brents v. Smith* (1911), 250 Ill. 521, 95 N.E. 484.) The ballot was properly not counted as a vote for Huber.

■■ On ballot 19—1 the squares before Huber's name and before the names of eleven other candidates are blackened rather than marked with an X. Huber contends that this should be considered a valid ballot as there are lines which intersect within the shading in the boxes. We, however, see no cross or intersecting lines in the square before Huber's name. The voter did put a cross in the square opposite the name of presidential candidate Jimmy Carter at the top of the ballot, and this cross can be easily discerned. In an apparent change of voting style, the voter then used his pencil to blacken entirely that square and the squares before the 11 other candidates we have alluded to. In each of these latter squares, including that of candidate Huber, the necessary intersecting lines are obviously absent. We find this to be an invalid attempt to vote. As the supreme court stated when faced with a similar situation in *Winn v. Blackman* (1907), 229 Ill. 198, 220, 82 N.E. 215, 223, "[t]he voter either did not know how to vote, or did not try to vote. There is no attempt to comply with the law, and the ballot was properly rejected."

■■ Ballot 20—1 requires a factual determination as to whether the lines in the square before Reznick's name cross. Although Huber argues that this ballot is identical with ballots 8—1 and 17—1, which were rejected by the trial court on the same question, we find that the trial court correctly determined that the lines cross and form a valid X. The lines intersect, if only slightly, and it was not error to count this ballot as a valid vote for Reznick.

■■ On ballot 25—1 the voter apparently attempted to write in a candidate for judge of the Fourth Judicial Circuit, then scratched it out and marked a dark X in the square before the name of William D. Kelly, who was running unopposed for that office. Huber contends that these markings constitute distinguishing marks. We find, however, that the marks were made in a deliberate attempt by the voter to indicate his choice of candidates (see *Barlick v. Kunz*) and as such do not constitute distinguishing marks. The ballot, which contains a proper X in the square before Reznick's name, was properly counted for Reznick.

■■ Ballot 25—5 contains an X in the Republican party circle at the top of the ballot. No other circles or squares are marked except for an X in the square before the names of Ronald Reagan and George Bush, Republican candidates for president and vice-president, which the voter then scratched out with his pencil. We believe, contrary to Huber's contention, that this mark indicates an attempt by the voter to indicate his choice of candidates and that the ballot was properly counted for Reznick.

■■ On ballot 26—4 the voter placed an X in the square before the names of presidentical candidate Carter and vice-presidential candidate Mondale and then used his pencil to scratch out this mark. The voter also voted for the Democratic candidate for congressional representative. No

other votes are cast for Democratic candidates. Moving to the Republican ticket, the voter made an X at the top of the ballot in the Republican party circle. The voter then placed X's in the Republican column for the presidential and vice-presidential candidates, the three candidates for trustees of the University of Illinois, the candidates for congressional and state representative, and the candidates for the four county offices, including Reznick for State's Attorney. The voter additionally placed X's in the squares opposite the blank lines where names of candidates did not appear for offices of judge of the appellate court (vacancy of George Moran), judge of the Fourth Judicial Circuit (vacancy of Raymond Horn), and judge of the Fourth Judicial Circuit (vacancy of George Kelly). Huber argues that these extra markings and those in the Democratic column constitute distinguishing marks as they serve no function to carry out the intent of the voter. These marks, however, do not appear to have been made with an intent to distinguish the ballot but were rather the result of the voter's mistake and his change of mind. (See *Winn v. Blackman.*) Thus, it was not error to count this ballot as a valid vote for Reznick.

■■ Ballot 27A—2 contains two X's, both made with a red felt-tip pen, in the Republican party circle and in the square before the Republican candidates for president and vice-president. The crosses are properly made, and Huber's only objection is that the use of the red marker makes this ballot distinguishable. It has been consistently held, however, that the use of a medium other than that supplied by the election officials does not, *per se*, render the ballot invalid. (*Rexroth v. Schein* (1903), 206 Ill. 80, 69 N.E. 240, *Grubb v. Turner* (1913), 259 Ill. 436, 102 N.E. 810; *Greene v. Bjorseth.*) In the cases cited by Huber, *Isenburg v. Martin* (1920), 293 Ill. 408, 127 N.E. 663, and *Talbott v. Thompson* (1932), 350 Ill. 86, 182 N.E. 784, ballots were held to be invalid not because of the colored pencils used but because of the irregular and unusual marks made with them. As we have noted, the crosses made by the voter here, despite their color, are quite ordinary and proper. These marks serve only to indicate the voter's choice of candidates and not to identify or distinguish the ballot. The trial court did not err in holding this ballot valid as a vote for Reznick.

Ballot 27A—7 contains an X in the Republican party circle at the top of the ballot as well as several heavy markings forming a cross in the square before the names of candidates Ronald Reagan and George Bush and a cross before the name of Dwight Friedrick, Republican candidate for State representative. Huber contends that the heavy X's before the names of Reagan and Bush serve to distinguish this ballot. For the reasons already set forth in our discussion of ballot 9—12, we hold that this ballot was not invalid and was properly counted by the trial court as a vote for Reznick.

Ballot 28—2 similarly contains heavy X's before the names of candidates Reagan and Bush, which Huber cites as distinguishing marks rendering the ballot invalid. We reject this contention for the reasons previously stated in our discussion of ballot 9—12. Although Huber contends further that the mark before Reznick's name is a Y rather than a cross, we find that the two lines do in fact cross and that the ballot was thus properly counted as a vote for Reznick.

■■ On ballot 28A—3 the voter placed an X before the names of each of the Republican candidates and additionally marked the box before the blank space for judge of the Fourth Judicial Circuit (vacancy of George R. Kelly) but did not write a name in the blank. Huber contends that this extra marking serves no purpose other than to distinguish the ballot and thus should be held to invalidate the ballot. It appears that the voter inadvertently marked the space for the write-in candidate in his attempt to vote for each of the Republican candidates individually. We find that this mark, which can be reasonably explained consistently with an honest purpose of the voter (see *Winn v. Blackman*), does not constitute a distinguishing mark. Although Huber further objects that the marking before Reznick's name is a Y rather than a cross, we agree with the trial court that the lines intersect, forming a valid cross. This ballot was properly counted for Reznick.

■■ Ballot 28A—4 contains an X in the squares before the Democratic candidates for circuit clerk, state's attorney, and coroner and a check mark following each of these names. These are the only three candidates voted for. The trial court held that the check marks following the names constitute distinguishing marks which render the ballot invalid. We agree. No explanation has been given as to how the marks were made on the ballot, and they appear to have been made by the voter himself. In such a case, the marks serve only to identify and distinguish the ballot. (See *Brents v. Smith*; *Greene v. Bjorseth*; *Barlick v. Kunz*.) It was not error for the trial court to refuse to count this ballot for Huber.

■■ Ballot 28A—6 is objected to on the grounds that the voter's write-in of "Hon. Raymond Horn" for judge of the Fourth Judicial Circuit (vacancy of Hon. Raymond O. Horn) makes this ballot unique and thus identifiable, as no other voter would be expected to write in the name of a deceased person. We note in passing that there is no way of knowing whether the voter knew that Raymond Horn, the late circuit judge of the Fourth District, was deceased, or that there was not another Raymond Horn in the Fourth Judicial Circuit. Moreover, it is not every distinctive mark which will render a ballot invalid but only those which appear to have been made in a deliberate attempt to identify the ballot and not through mistake or inadvertence. (*Parker v. Orr.*) The voter's attempt to write in a name for circuit judge, although an obvious error to some,

appears still to be the result of the voter's mistake and confusion and not, as Huber contends, equivalent to the voter signing his own name to the ballot. (*Cf. Parker v. Orr* where the court held that the words "yes" and "get" written on a ballot tended to indicate the voter's choice upon the proposition submitted while the name "Martin Lynch" written on another ballot could serve but one purpose, *viz.*, to indicate who voted the ballot.) We believe the trial court correctly found this to be a valid vote for Reznick.

We need not discuss Huber's contention that the court erred in holding ballot 29—1 to be a valid vote for Reznick. A review of the record shows that the court reconsidered its original ruling and found that the markings on the ballot constitute distinguishing marks which render the ballot invalid. The court thus did not count this ballot in making its final vote tally.

■■ On ballot 30—4 the voter blocked out an X in the square before Huber's name and wrote the words "Errorr [*sic*] No" beside it. The square before Reznick's name contains a proper X. The trial court ruled that these words did not constitute distinguishing marks as the voter made an obvious attempt to change his vote. We agree. (See, *e.g., Isenburg v. Martin*, where the court held that the obliterating of a square and the writing of the word "wrong" did not constitute a distinguishing mark.) Huber's argument that the court's ruling on ballot 30—4 was inconsistent with its ruling on ballot 20—5, which involved a similar situation, is not well taken. The record reveals that the trial court reconsidered its original ruling that ballot 20—5 was invalid and found it to be a valid vote for Huber. The court correctly counted ballot 20—5 for Huber and ballot 30—4 for Reznick.

Huber additionally objects to the court's ruling as to certain ballots which, although not designated as "spoiled" ballots (see Ill. Rev. Stat. 1979, ch. 46, par. 17—11), were placed in envelopes for spoiled ballots by the election judges and not counted. There were three ballots found in the spoiled envelope from precinct 2A and four in the spoiled envelope from precinct 21. The trial judge, after hearing testimony of election judges from these precincts, ruled that the presumption of correctness adhering to the election officials' actions (see *Rexroth v. Schein*) had been overcome in the case of three of the ballots from precinct 21, but held that the ballots from precinct 2A were invalid as spoiled ballots. We have examined the record and find no basis for disturbing the trial court's factual determination as to the validity of these ballots.

Anton Matzker, an election judge from precinct 21, testified that three ballots which should have been placed in the envelope for defective or objected-to ballots (see Ill. Rev. Stat. 1979, ch. 46, par. 17—16) were instead put into the envelope for spoiled ballots. This occurred after the

polls were closed and the ballots were taken from the ballot box and sorted out. The fourth ballot found in the envelope was not a regular ballot but was on a constitution question and, unlike the other three, was marked "void." We believe Matzker's testimony is sufficient to establish that the three ballots in question, S—21—1, S—21—2, and S—21—3, should have been considered as objected-to ballots rather than as spoiled ballots. (Cf. *Griffin v. Rausa* (1954), 2 Ill. 2d 421, 118 N.E.2d 249, where the evidence showed that "spoiled" ballots for which others had been reissued were properly rejected.) Huber does not challenge the court's ruling on the merits of these three ballots, and we find that the court correctly counted ballots S—21—1 and S—21—2 for Reznick and rejected S—21—3 as an invalid ballot.

As to the three ballots in the spoiled envelope from precinct 2A, election judge Thelma Harrison testified that one new ballot was requested by a voter while she was at the polling place and the ballot which was turned back in was placed in the spoiled ballot envelope. Mrs. Harrison stated that another ballot was taken from the general ballot box after the polls closed and placed in the spoiled ballot envelope because it had not been voted correctly. Mrs. Harrison stated that she was present at the polls the entire day except for a 30-minute lunch break and that she knew of no other ballots that were placed in the spoiled ballot envelope. Another election judge, Susie Pruitt, also testified that a ballot was taken out of the general ballot box and put into the spoiled ballot envelope after the polls closed but that she did not know if any other ballots were placed in the spoiled envelope.

We agree with the trial judge that this testimony is insufficient to overcome the presumption that there were three spoiled ballots in precinct 2A. Although two of the ballots have been ostensibly accounted for, these ballots have not been identified and there is no evidence showing that the third ballot was not properly placed in the spoiled ballot envelope after being exchanged for a new ballot. Huber has failed to sustain his burden of proof in this regard (see *Rexroth v. Schein*), and ballots S—2A—1, S—2A—2, and S—2A—3 were properly rejected by the trial court as invalid.

Huber's final contention of error regarding objected-to ballots concerns three absentee ballots, numbers 30—7, 30—8, and 30—9, which were challenged by the election judges and not opened or counted. The ballots were those of Donald and Inez Kimberlin and their daughter Deronda. The trial court, after hearing testimony from the voters and from two of the election judges in precinct 30, found that the voters did not meet the statutory requirement of residence in the precinct in which they voted so as to qualify as absentee voters (see Ill. Rev. Stat. 1979, ch. 46, pars. 3—1, 19—1) and ruled that their ballots were invalid. Huber

argues on appeal that the ballots were not properly challenged because the election judges failed to designate them as "rejected" ballots and that therefore the court had no discretion to rule upon the question of the voters' residence. We find, however, that the court properly ruled upon the residence question and that, in view of the evidence presented, it did not err in declaring the ballots to be invalid.

The statute governing the casting of absentee ballots (Ill. Rev. Stat. 1979, ch. 46, par. 19—9) provides in pertinent part that if the election judges casting the absent voters' ballots at the close of the polls find "that the applicant is not a duly qualified elector in such precinct * * * such previously cast vote shall not be allowed, but without opening the absent voter's envelope the judge of such election shall mark across the face thereof, 'Rejected', giving the reason therefor." The unopened ballots are then to be retained and preserved just as other rejected ballots (Ill. Rev. Stat. 1979, ch. 46, par. 19—9), and notice of the challenge is to be given by mail addressed to the voter's residence (Ill. Rev. Stat. 1979, ch. 46, par. 19—10). In the case at bar, election judge Debby Smith testified that when the Kimberlins' absentee ballots were presented for casting, she challenged them on the grounds that "[the Kimberlins] no longer lived here and hadn't lived here for at least six months." The ballots were then set aside in the envelope for challenged ballots and taken to the county clerk's office with the rest of the election supplies. Postcards were mailed to the Kimberlins at their Vandalia, Illinois, address in which they were notified that their ballots had been challenged. The election judges failed, however, to mark the ballots as "rejected" or to write the reason for the challenge on the ballots.

Huber contends that the failure to follow the statutory procedures in this regard precludes the court from inquiring into the absent voters' qualifications to vote. He asserts that since the ballots appear to be valid on their face, they should have been opened and counted by the trial court. Huber, however, ignores the fact that these ballots were set aside in the envelope for "challenged" ballots and not counted by the election judges. The official tally sheet certified by the judges from precinct 30 showed three rejected unopened absentee ballots which showing raised a presumption that these ballots had been properly rejected. (See *Tuthill v. Rendelman.*) While Huber would have us treat the marking procedure as mandatory rather than merely directory (see *Siedschlag v. May* (1936), 363 Ill. 538, 2 N.E.2d 836), the decided cases indicate that the contrary is true. *Cf. Griffin v. Rausa*, where the court rejected the contention that the statute regarding the marking of ballots as "defective" or "objected-to" was mandatory and held that the election judges substantially complied with the statute despite their failure to designate certain ballots properly.

We likewise find no merit in Huber's contention that because the

county clerk was required to ascertain whether or not applicants for absentee ballots are lawfully entitled to vote before mailing them a ballot (see Ill. Rev. Stat. 1979, ch. 46, par. 19—4), it was not proper thereafter to challenge the voters' qualifications. Section 19—10 provides that "the judges of the election or a majority thereof shall have power and authority to hear and determine the legality of such [absentee] ballot." Election judge Debby Smith testified that she challenged the Kimberlins' ballots and "everyone was in agreement with me." We hold, therefore, that the election officials in this instance substantially complied with the statutory procedures for rejecting absentee ballots, thereby raising a presumption of the validity of their challenge.

In an attempt to overcome this presumption, Huber presented the testimony of Donald and Inez Kimberlin who had moved with their daughter to Coleville, Missouri, in April 1980 and were living there at the time of the hearing in January 1981. It was from Coleville that their absentee ballots in the November 1980 election were executed. Inez Kimberlin testified that they had not actually moved to Coleville as they "lived on wheels." Donald Kimberlin, in a voluntary statement conditionally allowed by the court, said that he owned land in Vandalia, that he was semi-retired and that although he and his family live in a camping trailer and move from place to place, they wanted to make Vandalia their permanent address and vote there because they know the people in the area. Kimberlin added: "[W]e may pull out of Coleville [tomorrow]. * * * We may be in, go to Arizona or Florida." The court struck this testimony as improper but found that even considering the Kimberlins' declared intent, there was insufficient evidence to establish their residence in Vandalia for purposes of voting. We agree.

■■■ Under section 3—2 of the Election Code (Ill. Rev. Stat. 1979, ch. 46, par. 3—2) "[a] permanent abode is necessary to constitute a residence [for voting purposes]." As such, a person's "residence" is his or her principal dwelling place, and the term denotes a permanency of some measure. "Two elements are necessary to create a residence: (1) a physical presence in that place and (2) the intention of remaining there as a permanent home." (*Stein v. County Board* (1967), 85 Ill. App. 2d 251, 256, 229 N.E.2d 165, 168.) Unlike a "domicile," which one has continually from the moment of birth, a person need not at all times have a permanent abode or "residence." What constitutes a residence is a question of fact and, although declarations of a person's intent are admissible as evidence thereof, the determination must depend upon the surrounding facts and circumstances. *Stein v. County Board of School Trustees.*

■■ In the instant case, Huber failed to produce facts to indicate that the Kimberlins had established Vandalia as their permanent home or that, if such had been established, they had not abandoned it by their absence

therefrom. No information was elicited as to how long the Kimberlins had lived in Vandalia or the nature of their activities there. The ownership of property in an election district, without more, is not sufficient to qualify one as a voter in that district. (*Clark v. Quick* (1941), 377 Ill. 424, 36 N.E.2d 563.) Further, there is no evidence, other than the fact that the Kimberlins sent in absentee ballots, to indicate that they were registered to vote in precinct 30. (See *Tuthill v. Rendelman.*) While Donald Kimberlin stated that he and his family wanted to make Vandalia their permanent address for voting purposes, such an intent is only one aspect of residence and is belied by their physical absence from Vandalia and their lack of intent to return. We believe the trial court correctly ruled that the evidence was insufficient to overcome the presumption of invalidity of the Kimberlins' votes and that it was proper not to open and count ballots 30—7, 30—8 and 30—9.

■■■ Having affirmed the court's rulings on these various objected-to ballots, we must consider whether the court's actions in settling the resulting tie were proper. Huber contends preliminarily that the court erred in refusing to grant a continuance the parties requested pending a determination of the matter by lot. The decision to grant or deny a motion for continuance is within the sound discretion of the court (Ill. Rev. Stat. 1979, ch. 110, par. 59) and will not be disturbed on appeal unless there has been a manifest abuse of such discretion. (*Waltz v. Schlattman* (1980), 81 Ill. App. 3d 971, 401 N.E.2d 994.) Once trial or hearing begins, a continuance should be granted only where a "sufficient excuse is shown for the delay." (Ill. Rev. Stat. 1979, ch. 110A, par. 231(f).) Here, counsel requested a continuance to allow time for the parties to settle the issues of the case only after hearings had been held on January 30, 1981, and February 7, 1981, and the court had made its final ruling on February 18, 1981. The record reveals no reason why the parties needed additional time to reach a settlement of the case, and we believe the court was justified in refusing to grant the continuance.

■■ Huber contends finally that the court erred in choosing a coin flip as the method of determining the winner of the tie vote by lot. Section 23—27 of the Election Code (Ill. Rev. Stat. 1979, ch. 46, par. 23—27) provides:

> "If it appears that two or more persons have, or would have had if the legal ballots cast or intended to be cast for them had been counted, the highest and an equal number of votes for the same office, the persons receiving such votes shall decide by lot, in such manner as the court shall direct, which of them shall be declared duly elected * * *."

The statute does not specify the precise method to be used in determining the winner of a tie vote but merely directs that it be "by lot." The word "lot," as used in this provision, "signifies the existence of the element of

chance, and in this sense is defined as a contrivance to determine a question by chance or without the action of a man's choice or will * * *." 54 C.J.S. *Lotteries* sec. 30, (1948).

In the instant cause, there is every indication that the coin flip by the circuit clerk, however ineptly made, was still a decision made by chance. The trial judge described the process thus: "I gave the clerk a quarter from my pocket, a 25 cent piece, she flipped the coin and while the coin was in the process of leaving her hand and going into the air flipping, Mr. Reznick called heads. The coin came down, she completed the flip, showed me the coin and it was heads." For all that appears of record, the decision was the result of chance or lot and could just as easily have gone the other way. We hold, therefore, that the method selected by the trial court for determination by lot was as authorized by statute and that the court did not err in entering judgment for Reznick.

Judgment affirmed.

KARNS, P. J., and KASSERMAN, J., concur.