JOHN R. CARTER

*v.*

EDMOND PUTNAM.

*Filed at Springfield March 26, 1892.*

1. CONTEST OF ELECTION—*proof of alienage of voter.* On the contest of an election held in 1891, the contestant read in evidence a certified copy of a declaration of an intention to become a citizen of the United States, signed, "J. M. Palmer, M. D.," subscribed and sworn to October 6, 1888. This declaration recited that the applicant was born in Canada, in 1865, and that he emigrated to the United States in May, 1888. This was followed by a record of a physician's certificate found in the county clerk's office, which showed this: "Registered March 19, 1890, J. Allen Palmer; post-office, Alvin; age, twenty-six; nativity, Illinois." The date of the certificate was February 19, 1891, based upon a diploma and license from a college at Toronto. It was proved that J. A. Palmer, the voter, was a physician, aged about thirty-five years, and that before the election he said he was a Canadian, and that he went from Canada to Green Bay, Wisconsin, and finally came here : *Held,* that the evidence *prima facie* showed that the person so voting was not a voter.

2. SAME—*thirty days' residence prior to.* A voter moved with his family upon a leased farm in the town in which he voted, twenty-nine days before the election, but before that date he moved his cow, plows, chickens and a cupboard upon the farm: *Held,* that the removal of these articles, while he and his family still remained at his former residence, was not sufficient to change his residence. Had he rented the farm in the town to which he proposed to remove, more than thirty days prior to the election, and gone upon it himself with a part of his goods, and remained there, occupying the house as a residence until his family joined him, which was twenty-nine days before the election, he might have claimed a residence from the time he went upon the farm.

3. SAME—*residence—whether lost by temporary absence with intention of returning.* A party, by a temporary removal of himself and family into another State with the intention to return, will not thereby lose his residence in this State when he does not vote in such other State, or do any act from which it may be inferred that he acquired a residence there.

4. SAME—*residence—of unmarried man—whether changed by change of father's residence.* Where an unmarried young man's father, with whom he has been residing, changes his residence by moving into another town near his former residence, but still continues to keep a store, as before, in the town from which the father removed, intending to keep his residence there, and does not vote elsewhere, the son will not lose his residence in such town, although he may board with his father a portion of the time and occasionally have his washing done at his father's. The intention of a party has an important bearing on the question of his residence, especially when he is unmarried and has no family.

APPEAL from the County Court of Vermilion county; the Hon. JOHN G. THOMPSON, Judge, presiding.

Mr. E. R. KIMBROUGH, and Mr. G. W. SALMANS, for the appellant.

Mr. E. WINTER, and Mr. W. R. LAWRENCE, for the appellee.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

This was a proceeding brought by Edmond Putnam, in the county court of Vermilion county, against John R. Carter, to contest his election to the office of supervisor of the town of Ross, in said county, at an election held on the 7th day of

April, 1891.   After the election had been held, upon a canvass of the votes it was declared that Carter had received 325 votes, Putnam 324 votes, and Fayner 23 votes.   Carter was thus declared elected by a plurality of one vote.   On the hearing in the county court the court found that Carter received at the election 325 votes, but also found that J. A. Palmer and John C. Deck, two of the voters who cast their ballots for Carter, were not legal voters.   It was set up in the answer, among other things, that Howard L. Dwiggins and Charles Smith voted for contestant, and that they were not legal voters. Upon this branch of the case the court found that those voters did vote for the contestant, but that they were legal voters. The result of the finding therefore was, that Carter received 323 votes for the office of supervisor, and Putnam received 324 votes, giving Putnam a plurality of one vote, and in accordance with the finding the court entered a decree declaring Edmond Putnam elected supervisor.   ·

From the foregoing brief statement of the condition of the record the first question to be determined is, whether J. A. Palmer and John C. Deck were legal voters at the time they cast their ballots for Carter; and second, whether Howard L. Dwiggins and Charles Smith, who voted for Putnam, were, at the time of voting, legal voters.

In the case of Palmer, the contestant read in evidence a certified copy of a declaration of intention, signed "J. A. Palmer, M. D.," to become a citizen of the United States, made in Brown county, Wisconsin, subscribed and sworn to October 6, 1888.   The declaration recites that the applicant was born in Ontario, Canada, in or about 1865; that he emigrated to the United States, and landed at Port Huron, Michigan, in May, 1888; that it was his intention to become a citizen, etc.   Following this, contestant read in evidence the record of a physician's certificate found in the county clerk's office in Vermilion county.   This record contained the following: "Registered March 19, 1890, J. Allen Palmer; post-office,

Alvin; age, twenty-six; nativity, Illinois; number of years in practice, eight.; date of certificate, February 19, 1891,— based upon diploma and license of college of Toronto." In addition to the record evidence the contestant introduced evidence that the voter, J. A. Palmer, was a physician, and that he came from Canada. Upon this point Albert Golden testified: "I reside at Alvin, and have known J. A. Palmer since last fall. He is a physician, about thirty years of age. I had a conversation with Palmer before the election. He said he was a Canadian; that he went from Toronto, Canada, to Green Bay, Wisconsin; that he went from Wisconsin to Chicago, and remained there a year or two, then went to Grand Rapids, where he had relatives, and then came to Alvin to reside."

This evidence was, in our opinion, sufficient, *prima facie* at least, to establish the fact that the J. A. Palmer who registered as a physician in Vermilion county and voted at the election, was the same J. A. Palmer, M. D., who filed his declaration to become a citizen of the United States in Brown county, Wisconsin. Dr. Palmer, at the time of the trial, was still in the county, and if he was not the same Dr. Palmer who came from Canada and filed his declaration in Brown county, Wisconsin, to become a citizen, it would have been a light task for appellant to bring Dr. Palmer into court and place the matter at rest, but he was not produced as a witness. If, therefore, it is true that the voter, Palmer, is the same person who declared his intention in Brown county, Wisconsin, to become a citizen of the United States, it follows that he was not a legal voter at the election in question.

As respects the voter J. C. Deck, we think it plain that he was not a legal voter at the election for supervisor, held on the 7th day of April, 1891. He was a citizen and resident of the State of Illinois, but before he was entitled to vote, the statute required him to reside in the town or election precinct thirty days next before the election. In the spring of 1891 Deck resided in Newell township. About the 1st of March,

however, he rented a farm in the town of Ross, but he did not move upon the farm until the 9th day of March. In computing time the rule is, to exclude the first day and include the last. Adopting this rule, there would be twenty-two days in March and seven in April,—in all, twenty-nine days' residence in the town of Ross before the election,—one less than required by the statute to make a legal voter. Appellant, however, attempted to remove the difficulty by proving that Deck moved his corn, plows, chickens and a cupboard before the 9th day of March. The removal of these articles while Deck and his family still remained residing in the town of Newell would not be sufficient to change his residence. Had he rented the farm on the 1st of March, and gone upon it himself with a part of his goods, and remained there, occupying the house as a residence until his family joined him on the 9th, then he might with propriety claim a residence from the date he went upon the place. But that was not done.

The next question to be considered is, whether Howard Dwiggins, who voted for appellee, was at the time a legal voter in the town of Ross. He was an unmarried man, and prior to the 12th day of January, 1891, resided with his father in the town of Ross. On January 10 Dwiggins and his father leased land in Grant township, from January 10, 1891, to March 1, 1892, and on the 12th of January the elder Dwiggins, with his family, moved upon the leased property. Howard Dwiggins kept a store in the town of Ross, where he transacted all his business. He testified, that after his father moved he took his meals at various places,—sometimes at his father's, sometimes at Fleming's, and sometimes at the hotel. He slept at his father's house, and most of the time took breakfast and supper there. He kept part of his clothing at his father's and part at his store. His washing was done at Danville, Rossville and at his father's. He slept most of the time at his father's, but did sleep a part of the time at the hotel. It also appears that he held the office of town clerk in the town of

Ross until the spring election in question, paid his taxes there, and claimed that to be his residence. The mere fact that Dwiggins went across the town line to sleep and eat at his father's house would not be sufficient to change his residence from the town of Ross to the town of Grant. He retained his business in the town of Ross, claimed that as his residence, and his intention was to keep his residence in that town. The intention of a party has an important bearing on the question of residence, especially where the party is unmarried and has no family, as was the case here. So long as he remained in the town of Ross engaged in his business, and treated that as his permanent abode, he had the right to cast his vote in that town. Dwiggins resided in the town of Ross before his father came there. After his father came, he lived at his house. When the father moved across the town line he boarded with his father and slept at his house, but did not intend, as he testified, to change his residence, and we think his intention, under the facts as they appear, must control.

We will next consider the evidence in regard to the voter Charles Smith, who voted for the contestant. It appears that Smith moved from Vermilion county across the State line into Indiana in the spring of 1889. He testified that he moved back on the 3d day of April, 1890, and in this he is corroborated by his son. Conceding that he had lost his residence in Illinois by moving in the spring of 1889, if he and his son are to be believed, he was entitled to vote on April 7, 1891, as he had been in the State more than one year next before the election. There is, however, much evidence in the record tending to prove that he did not move back until as late as the 10th day of April, 1890, and we are inclined to think the evidence, when all considered, fairly preponderates in favor of that view. But notwithstanding that fact, we are still inclined to think Smith was a legal voter. We do not think the evidence shows that he lost his residence in Illinois or acquired a residence in Indiana. He seems to have been of

a migratory character, and had a fondness for moving across the State line, from one State to the other, but he does not seem to have intended to abandon his residence in Illinois. He testified: "I went over into Indiana to get a house to live in, and to have work more handy to me. I had no intention of staying there at all. My intention was to just move back and forth for a while, until the property was vacated by the old folks, and then I intended to settle down in Vermilion county, on the property we now own. I never cast a vote outside of Vermilion county, Illinois, in my life. I never claimed my residence in Indiana. I claimed it to be in the State of Illinois all the time."

While several witnesses testify that Smith stated, about the time he moved to Indiana, that "he went to stay and went for good," still there is no evidence whatever in the record that he ever voted in Indiana, or did any act from which it might be inferred that he had acquired a residence in that State, except what might be inferred from the fact that he moved there with his family and remained during the time heretofore stated. If Smith, when he moved to Indiana, intended to return to Vermilion county, as he testified he did, and had no fixed intention of acquiring a residence elsewhere, it is plain that he never lost his residence in this State. An absence for months, or even years, if all the while the party intended it as a mere temporary purpose, to be followed by a resumption of the former residence, will not be an abandonment of such residence. *Moffett* v. *Hill,* 131 Ill. 239.

The judgment of the county court will be affirmed.

*Judgment affirmed.*