(No. 27838.— )
L. B. TUTHILL, Appellant, *vs.* FORD L. RENDELMAN, Appellee.

*Opinion filed May 16, 1944—Rehearing denied September 18, 1944.*

322

PEYTON BERBLING, ASA J. WILBOURN, DOROTHY WILBOURN, all of Cairo, and HAROLD N. LINGLE, of Anna, for appellant.

R. WALLACE KARRAKER, and FORD L. RENDLEMAN, both of Jonesboro, for appellee.

Mr. JUSTICE STONE delivered the opinion of the court:

This is an election contest over the election on November 3, 1942, for county judge of Union county. Plaintiff, the contestant, lost in the contest and appeals, assigning numerous errors. Defendant, the contestee, has assigned numerous cross errors. On the official returns defendant received 3423 votes and plaintiff 3405. The main issue was whether there were irregularities or illegal votes cast which changed the result of the election. The court recounted all. No question as to proper preservation of the ballots arises.

It was stipulated that a count of the undisputed ballots gave plaintiff 3316 votes and defendant 3288, or a majority of 28 votes for plaintiff. It was further stipulated that of the ballots returned from Cobden precinct No. 2, there were 170 ballots which bore the initials "E.L.M." Of these defendant received 89 and plaintiff 75, with 6 not voting for either candidate. The evidence shows, and it is not disputed, that the initials "E.L.M." on said ballots, were not the initials of a judge of that precinct, but that one Earl L. Morgan acted as a clerk of the election in that precinct. The court held these to be valid votes, on the ground that the provision of the statute relating to elections, requiring that a judge initial the ballots, was not mandatory but directory. On the recount 87 ballots bore no initials. None of them were counted. Ten ballots, marked exhibits B-1, 2, 4, 6, 8, 14, 20, 21, 22 and 24, involve factual questions and are certified to this court for examination. The trial court found ballots B-1, 8, 20 and 24 valid and counted them for plaintiff. B-6 and 21 were held valid and counted for defendant. Ballots B-2, 4, 14 and 22 were held not valid and not counted.

Defendant contended a large number of the voters were not qualified because not registered in accordance with the Permanent Registration Act. (Ill. Rev. Stat. 1941, chap. 46, par. 153.1 et seq.) The court held the applicable pro-

visions of the Permanent Registration Act to be directory and not mandatory and that the voters whose ballots were objected to had complied with the requirements of the election officials who registered them, and that if their registration was incomplete such did not affect the validity of their ballots. They were counted for plaintiff and constitute the basis of certain cross errors assigned. Other ballots were objected to and will hereinafter be discussed.

The trial court added to the 3316 agreed ballots for plaintiff, 75 of those cast in Cobden No. 2 precinct; two of the B exhibits agreed upon, and exhibits B-1, B-8, B-20 and B-24, making a total of 3397 votes for plaintiff. From that total 19 votes were deducted for reasons which will be discussed later in this opinion. The court found a total vote for plaintiff of 3378. By taking the agreed ballots for defendant, 3288, and adding thereto 89 cast in Cobden No. 2 precinct, six of the B exhibits not objected to, and exhibits B-6 and B-21, the court found a total of 3385 for defendant, and that defendant had been elected by seven votes.

Plaintiff's errors relied upon are, that the trial court erred in counting 164 ballots cast in Cobden precinct No. 2 endorsed "E.L.M.," and in refusing to count for plaintiff certain other votes hereinafter referred to.

Defendant's cross errors are that the court erred in holding the new Permanent Registration Act directory and not mandatory and in refusing to deduct from plaintiff's vote the 28 votes cast in violation of its provisions, and in refusing to deduct from plaintiff's total vote certain votes hereinafter referred to.

Defendant insists that plaintiff agreed and consented to count the 164 ballots cast in Cobden precinct No. 2, apparently initialed by a clerk of the election, claiming that it was agreed that there were 75 marked for Tuthill and 89 for Rendleman, and the trial judge in his statement of reasons for his decision found such had been stipulated.

We cannot find, in the record, support for that conclusion. The only agreement or stipulation with reference to those 164 ballots appearing in the record, is as follows: "It is stipulated and agreed by the parties hereto, * * * that, in addition to the above, in the ballots brought in in a sack marked 'Plaintiff's Exhibit 7,' being Cobden precinct No. 2, there were 170 ballots which bore the initial 'E.L.M.,' presumably of Earl L. Morgan, a clerk of said election in said precinct, which ballots, on being counted, gave 89 for Rendleman, 75 for Tuthill, and 6 not voted for either candidate." It will be noted that this stipulation recited the facts as to the number of ballots cast in that precinct and how they were marked for plaintiff and defendant, and that six were not marked for either candidate. There was no dispute as to how the ballots were marked, their validity depending upon whether the initials "E.L.M." rendered them invalid. The stipulation had the effect of waiving questions of their preservation and of an agreement as to their number and how they were marked. This, as we view it, amounted to no more than an agreement as to the condition of the ballots and what they showed. Plaintiff specifically objected to counting any of the ballots so initialed. Whether they should be counted was a question for the court to decide. *Wood* v. *Hartman,* 381 Ill. 474; *Sibley* v. *Staiger,* 347 Ill. 288.

Section 22 of the Ballot Act (Ill. Rev. Stat. 1941, chap. 46, par. 311, p. 1484,) provides: "One of the judges shall give the voter one, and only one ballot, on the back of which such judge shall endorse his initials in such manner that they may be seen when the ballot is properly folded, and the voter's name shall be immediately checked on the register list."

Section 26 of the same act provides: "No ballot without the official endorsement shall be allowed to be deposited in the ballot box, and none but ballots provided in accordance with the provisions of this act shall be counted." De-

fendant's counsel argue that these provisions of the statute are directory only and not mandatory. They cite *Neff* v. *George,* 364 Ill. 306, *Waters* v. *Heaton,* 364 Ill. 150, and *Boland* v. *City of LaSalle,* 370 Ill. 387, in support of this contention. In the *Waters* and *Neff cases,* ballots were initialed by one judge with the initials of another judge. In the *Waters case* the cases of *Laird* v. *Williams,* 281 Ill. 233, *McNabb* v. *Hamilton,* 349 Ill. 209, and *Blattner* v. *Dietz,* 311 Ill. 445, holding illegal ballots initialed by one judge with the initials of another judge, were on that point overruled. The *Boland case,* where a clerk initialed ballots using his own initials, relied on the *Waters* and *Neff cases* in holding the statute directory and not mandatory.

Appellee relies upon *Wood* v. *Hartman,* 381 Ill. 474, in which the ballots bore a check mark, uniform in size, located to the right of the facsimile signature of the county clerk, but did not bear a judge's initials. This court cited section 26 providing that "no ballot without the official endorsement shall be allowed to be deposited in the ballot box, and none but ballots provided in accordance with the provisions of this act shall be counted," and held the provisions of sections 22 and 26 mandatory and ballots not in compliance therewith void.

*Waters* v. *Heaton, Neff* v. *George,* and *Boland* v. *City of LaSalle,* are in harmony with neither the earlier nor subsequent decisions of this court construing the language of section 22 of the act, requiring that one of the judges "shall endorse his initials" on the ballot. *Sibley* v. *Staiger,* 347 Ill. 288; *Allen* v. *Fuller,* 332 Ill. 304; *Blattner* v. *Dietz,* 311 Ill. 445; *Kelly* v. *Brown,* 310 Ill. 319; *Neal* v. *Odle,* 308 Ill. 469; *McCreery* v. *Burnsmier,* 293 Ill. 43; *Wood* v. *Hartman,* 381 Ill. 474; *Barlick* v. *Kunz,* 375 Ill. 318; *Lacy* v. *Rhodes,* 369 Ill. 167.

The right of franchise is the one act of sovereignty open to all qualified American citizens, and courts should be at least as jealous to safeguard that right as the Gen-

eral Assembly in passing the act. The rule stated in *Sibley* v. *Staiger,* 347 Ill. 288, we believe to be the safe one to adhere to. That rule is: "While it is a rule that mistakes or omissions of the officers in charge of an election will not defeat the plainly expressed will of the voters, yet the rule does not apply where the officers have failed to perform mandatory duties of a precautionary character which safeguard the votes of the electors." Although proper application and construction of such statute may result in the loss of franchise to a voter in some instances, by far the greater good is to be derived from construing the language of a statute in accordance with its plain meaning and intent. As this court said in *People ex rel. Vance* v. *Bushu,* 288 Ill. 277, "It is far better that the people of a town shall lose their vote in a single instance than that there shall be written into the law rules which permit election officers to disregard the plain mandates of those provisions of the law intended to protect and safeguard the ballot."

The provision of section 22 of the act, that "one of the judges shall give the voter one, and only one ballot, on the back of which such judge shall endorse his initials," and the provision of section 26 of the act, that "none but ballots provided in accordance with the provisions of this act shall be counted," are mandatory and only such ballots as conform to those provisions shall be counted in the canvass of the ballots by the judges, or by the court on a recount in a contest. The holding of this court to the contrary in *Waters* v. *Heaton,* 364 Ill. 150, *Neff* v. *George,* 364 Ill. 306, and *Boland* v. *City of LaSalle,* 370 Ill. 387, is hereby overruled. The trial court erred in counting the 164 ballots in Cobden precinct No. 2.

Plaintiff next contends it was error to deduct from his total the votes of Luther Morse, Willis Wilson and Thomas Morse, voters in Reynolds precinct. It was objected by defendant that these voters received assistance and voted

for plaintiff without making the necessary affidavits. It is admitted that they were regularly registered in their precincts; that each applied for, received a ballot and voted. No question is raised concerning the correctness of the action of the court in making deductions from either candidate's vote if the votes deducted were illegal. The question of whom the voter voted for was in each case settled in the trial court and no such question is raised here. Defendant introduced in evidence the registration cards and applications for ballot of the voters just named. On none of them was there any indication that the voters asked for or received assistance. Defendant called as a witness one Clarence Walker, a judge of election of Reynolds precinct. He testified he knew the three voters named; that they resided in and were registered in that precinct; that they asked for and were given assistance; that they were not challenged when they voted and that none of them made affidavits that they needed help. This witness does not say which judge aided the voter. He gives no evidence indicating whether these voters were suffering disabilities which, under the statute, would excuse the necessity for such affidavit. He testified on cross-examination that none of the judges asked for affidavits from any person assisted and that no one challenged their right to vote. It is not claimed they were not qualified voters.

Section 24 of the Ballot Act, (Ill. Rev. Stat. 1941, chap. 46, par. 313, p. 1485,) so far as applicable to this inquiry, provides that where assistance in marking ballots is asked for, "The clerks of election shall enter upon the poll lists after the name of any elector who received such assistance in marking his ballot a memorandum of the fact." Section 21½ of the Permanent Registration Act (Ill. Rev. Stat. 1941, chap. 46, par. 153.22,) provides that a registered voter, upon application to vote, shall sign an application for ballot; that the judges of election shall compare the signature of the voter on his application with

his signature on his registration card. That section then provides: "One of the judges or clerks of election shall check the certificate of each applicant for a ballot after the registration record has been examined, and shall sign his initials on said certificate in the space provided therefor, and shall enter upon such certificate the number of the voter in the place provided therefor, and make an entry in the voting record space on the registration record, to indicate whether or not the applicant voted. Such judge or clerk shall then hand such certificate back to the applicant in case he is permitted to vote, and such applicant shall hand it to the judge of election in charge of the ballots. The certificates of the voters shall be filed in the order in which they are received and shall constitute an official poll record. The terms 'poll lists' and 'poll books,' where used in this Act, shall be construed to apply to such official poll record."

Willis Wilson's voter's number was 17; Luther Morse was No. 108, and Thomas Morse No. 109. Each was shown to have been checked by M. F. McRaven, judge of election. • The official poll record shows that each of the three voters was regularly registered, each applied for a ballot and received and signed an application for ballot. Nothing thereon shows that any of them received assistance, nor is there any indication thereon of any irregularity which would disqualify any of them from voting.

Judges and clerks of election are presumed to perform the duties required of them by the statute and their records are the best evidence of the qualification of the voter to vote at an election. It is universally held that parole evidence is incompetent to vary a record required by law to be kept. It was error to receive in evidence the testimony of Walker to impeach the record made by the judges and clerks. Without this testimony there is no evidence that Wilson and the two Morses received assistance or to show

that they were disqualified to vote, and their votes should not have been deducted from the total of plaintiff.

Plaintiff insists that it was error to hold that Earl Halterman and Mary Halterman were not legal voters in the precinct in which they voted and in deducting their votes from his total. The trial court held that the votes of Earl and Mary Halterman could not be counted, as they had no permanent abode in Anna precinct No. 1, from which their votes were cast. Both were registered as legal voters of Anna precinct No. 1, their residence being stated as 311 Spring St., Anna, Illinois. Both, according to the record cards, voted in said precinct in the primary and in the judicial election of 1942. Their respective applications for ballot show that they voted by mail. Neither their registration nor their right to vote was challenged. They were, and for more than ten years had been, employees of the State at a State institution at Alton. Testimony was offered by defendant to show that they did not actually reside at 311 Spring St., in Anna, Illinois.

Defendant, to sustain the holding of the trial court, argues that as the Permanent Registration Act requires a permanent abode and dwelling place within the precinct to constitute residence, these voters had no right to vote in Anna No. 1 precinct. Plaintiff, to sustain his contention, argues that, as the record shows these voters were employed by the State of Illinois, they were entitled to vote in that precinct under section 4 of article VII of the Illinois constitution, which provides: "No elector shall be deemed to have lost his residence in this state by reason of his absence on business of the United States, or of this state, or in the military or naval service of the United States." Plaintiff's counsel say "absence," as used in the constitutional provision, means absence from his precinct or place of residence, while defendant's counsel argue that "absence" means absence from the State. This question, though one

of substantial importance, has not heretofore been passed upon by this court. It seems clear that in construing the Permanent Registration Act, it must be borne in mind that its provisions as to residence are not to be applied to those coming within the terms of the constitutional provision. To hold otherwise would be to render these provisions of the Permanent Registration Act unconstitutional.

The questions here, therefore, are whether the language of the act requiring actual residence applies to those coming within the constitutional exemption, and if it does not, whether these voters come within such exemption. Therefore a discussion of the essentials of residence and abode are not of first importance. It seems clear that "absence," as used in the constitution, must mean absence from the residence of the voter, for the reason that there are many situations where the voter may be absent from his residence for a long period of time, by reason of business for the State or the United States, or even in military or naval service of the United States, and yet not be absent from the State on such duties. He is nevertheless within the protection of the constitution. The constitution does not say "absence from the State" and we do not believe such was the intention of its framers. Certainly their registration from the precinct in which they had voted, or of which they were qualified voters before entering upon such business or service, is an indication that these voters desired to retain their residence in such precinct.

The clear intent of the constitutional provision that such voter shall not be "deemed to have lost his residence," is to give to him the right to retain such voting residence if he so desires. While the registration act requires that actual residence in the precinct,—describing the location of the building by street number or the like,—shall be given, such provision can have no application to the registration of a voter absent from the precinct because of State or United States business or service. He cannot be expected

to give a street address at which he is no longer an actual resident. Yet he is not to lose his residence in the precinct. While the act does not specifically state how such a person shall indicate his residence in the precinct, it seems to us that an efficient method of such registry is to register such voter as residing in the precinct and to indicate his absence from the precinct because of State or United States business or service. Thus is the validity of the Permanent Registration Act preserved, and the intent of the General Assembly met. Sufficient provision is made in the Permanent Registration Act to check and challenge any person not legally authorized to register who seeks to do so. Ill. Rev. Stat. 1941, chap. 46, par. 153.10, p. 1425.

The record shows the registration cards of both the Haltermans to be regular in form, including their voting records. They voted at the 1942 primary and at the judicial election, and each registration is marked "complete." Their applications for ballots were marked: "voted by mail." There is nothing in the record to indicate that their right to vote was challenged and no contention is made that there was any irregularity in their ballots, the sole contention being that they were not residents of the precinct in which they voted.

The act provides that each voter must apply in person to have his or her name entered on the permanent registration record, and that before a voter can be registered he or she must, under oath, answer questions to satisfy the statutory requirements in order to entitle a person to be registered as a voter in the precinct in which he seeks to register. Provisions are made for the challenge of that right, and if no challenge is filed the registration card is to be marked "complete."

The Haltermans signed the necessary affidavits and their registration cards were marked "complete," in accordance with the requirements of the Permanent Registration Act. No objection or challenge was made to their

right to be registered voters in the precinct in which they registered. It is admitted they are engaged at Alton on business of the State. They each signed an application for ballot and voted by mail.

Section 10 of the Absent Voters Act (Ill. Rev. Stat. 1941, chap. 46, par. 471,) provides for the challenge of any absent voter's ballot before it is placed in the ballot box, and for notice to the voter in case the challenge is sustained. The Haltermans' registration cards being complete, and no challenge entered as to their right to vote, the record, quite aside from the constitutional provision referred to, constituted *prima facie* evidence of their right to vote, and the presumption arose that the votes cast by them were legal votes. This presumption continued until overcome by evidence. (*Gentry* v. *Reinhardt,* 350 Ill. 582; *Flowers* v. *Kellar,* 322 Ill. 265.) The evidence on the trial of the contest was not sufficient to overcome the *prima facie* record of their right to vote, and, for that reason also, it was error to deduct their votes from the total of plaintiff.

It is next contended by plaintiff that it was error to deduct eight votes from his total on the ground that the voters Jennie Ralls, William E. Ralls, Manual Smith, Mary O. Smith, Norma Bauer, Benjamin Morris, Rosa Morris and Carl Miller, did not reside in the precinct in which they registered and voted. This ground of disqualification in effect involved the charge that the voters had committed a criminal offense. In such a case the law raises the presumption of innocence in their behalf and casts upon appellee the burden of proving that they were not qualified to vote. (*Rexroth* v. *Schein,* 206 Ill. 80; *Dorsey* v. *Brigham,* 177 Ill. 250; *Behrensmeyer* v. *Kreitz,* 135 Ill. 591.) The charge also involves the imputation that the county clerk before whom they registered, was derelict in official duty in permitting their registration. The presumption of law is that the county clerk discharged his duties properly and legally, and acted correctly in per-

mitting each of them to register. (*Dorsey* v. *Brigham,* 177 Ill. 250.) It was incumbent upon appellee, in order to justify the court in withdrawing the ballots of those voters from the count, to overcome, by proof, the presumptions of innocence on the part of the voters and of regularity of the official action of the county clerk. Though the law cast upon defendant the burden of proving a negative, full and complete proof in rebuttal of these presumptions is not required, but proof must be produced sufficient to render the existence of the negative probable. *Rexroth* v. *Schein,* 206 Ill. 80; *Behrensmeyer* v. *Kreitz,* 135 Ill. 591; *City of Beardstown* v. *City of Virginia,* 76 Ill. 34.

In support of his contention that the Ralls, Smiths, and Norma Bauer voted in precincts in which they did not reside, defendant offered and there was received in evidence a resolution of the county board of Union county, filed August 25, 1899, purporting to fix the boundaries of the precincts of the county, including Reynolds and Meisenheimer precincts, in one or the other of which these voters resided. This resolution enumerated the sections and parts of sections of these townships and, as to Reynolds precinct, provided: "and all that portion of sections five (5), eight (8), and seventeen (17) lying west of Clear Creek of Township thirteen (13) South Range Two (2) West." Meisenheimer precinct was declared to consist of certain enumerated sections "and all of that portion of sections five (5), eight (8), and seventeen (17) lying east of Clear Creek." This resolution was accompanied by a map which showed Clear creek to be a meandering stream extending through sections 5, 8 and 17. The objection, as to five of the eight voters above named, is that those voting in Reynolds precinct resided in Meisenheimer precinct, and those voting in Meisenheimer precinct resided in Reynolds.

Plaintiff insists the map and resolution are not competent evidence to prove the boundaries of Reynolds and Meisenheimer precincts, as the law in force in 1899 (Hurd's

Stat. 1899, chap. 46, sec. 30, p. 741,) required that any redistricting of election precincts be done in a regular July meeting of the county board or at a special or adjourned meeting in August, and that the record does not disclose that the meeting of the board was the regular July meeting or an adjourned meeting. Even though this objection be good, it would avail nothing in this inquiry, since there is nothing in the record to show what the boundaries of Reynolds and Meisenheimer precincts were prior to the resolution in August, 1899, fixing such boundaries. The resolution established the east boundary of Reynolds precinct as all that part of sections 5, 8, and 17 lying west of Clear creek, and the west boundary of Meisenheimer precinct as all that part of sections 5, 8 and 17 lying east of Clear creek. This, without more, does not indicate whether, in case the creek changed its course through flood waters,— as it is commonly known creeks often do,—the west bank of Clear creek as it existed at the time the resolution was passed or as changed should constitute the boundary line between the two precincts. The record shows that sometime after August, 1899, the channel of Clear Creek, through sections 5, 8 and 17, was straightened by digging a drainage ditch. The ditch, when completed, became the channel of Clear creek through those sections.

After August 25, 1899, voters living in those parts of said sections 5, 8 and 17 lying west of the west bank of Clear creek, as it then flowed, were residents of and entitled to vote in Reynolds precinct, and those living in the parts of those sections east of the creek were residents of and entitled to vote in Meisenheimer precinct. It is here claimed by plaintiff that because of cutting the ditch to straighten the channel of Clear creek, those of the above-named voters who, before the change of the channel, lived and voted in Reynolds, now live in Meisenheimer, and those then living and voting in Meisenheimer now live in Reynolds, and that therefore all of the five votes were

legal. These voters all registered before the county clerk. No question was then raised as to their right to register in the precinct named. No challenge of the right of these voters to vote was raised when they voted. There is, in fact, no question that they were qualified voters in one of those two precincts. The question was first raised on the trial of the election contest. As heretofore stated, where the card of registration of a voter is marked "complete," and where no challenge is interposed to the correctness of the registration or of the right of that particular voter to cast his or her ballot, there is a presumption of the validity of the vote cast. No evidence, of any assistance, appears in the record to determine just where the creek flowed at the time of the resolution in 1899, nor after the ditch was cut. William E. Ralls and Mary Smith each testified the houses in which they, respectively, lived were east of Clear creek as it flowed through sections 5, 8 and 17 prior to the construction of the drainage ditch which changed the course of said creek. It was error to deduct the Ralls and Smith ballots.

The only evidence that Norma Bauer was not a resident of Reynolds precinct, where she was registered, was the testimony of Clarence Walker that "she did not reside in Reynolds precinct; she lived in the Meisehheimer precinct." That testimony is but a conclusion of the witness and is not sufficient, in the condition of this record as to boundary lines of the two precincts, to overcome her permanent registration card and record of voting in Reynolds precinct without challenge. It necessarily follows that it was error to deduct her ballot from the total of plaintiff.

Benjamin Morris and his wife Rosa were regularly registered in Alto Pass precinct. Their permanent registration cards were marked "complete," showing their right to vote in that precinct. Their applications for ballots were regular and did not have thereon any notation that their right to vote was challenged. The testimony in sup-

port of the objection to their ballots was that of one Lloyd Smith, who testified that they lived in Wolf Lake precinct on Miles Smith's farm, which Smith acquired through the Federal Land Bank. Benjamin Morris testified that he had lived in Wolf Lake precinct but in June, 1942, he and his wife moved to a forty-acre farm owned by Miles Smith, which he bought from his sister, and that this forty acres was north of the Jake Smith place; that they lived on the forty acres east of the forty of Ritta Miller, which joined the forty acres they lived on, on the northwest. No testimony was offered by defendant to locate the forty acres on which Morris testified they live, to determine whether it was in Alto Pass or Wolf Lake precinct. The proof did not overcome the presumption of the validity of their votes cast unchallenged. It was error to deduct their ballots from the total of plaintiff's vote.

Defendant's exhibit No. 64 shows that Carl Miller registered as a resident at 101 Ann St., Anna, Illinois, Anna precinct No. 2. His registration card was marked that he voted in the 1942 primary and the judicial election in 1942. An application for ballot signed Carl E. Miller, 101 Ann St., was in evidence as defendant's exhibit. No notation appears thereon that his right to receive a ballot was challenged. To overcome the presumption of the validity of Carl Miller's vote, Luke Hall testified he knew Carl Miller, son of Mose Miller, and that he knew that Carl Miller, on November 3, 1942, lived in E. P. Owen's place in Stokes precinct, with his wife; that Carl Miller, as far as he knew, did not vote. On cross-examination he testified that "Elmer Carl Miller did not vote here." It is readily seen that the testimony of Luke Hall did not identify the Carl Miller he knew and who, as he testified, lived in Stokes precinct, as the Carl Miller registered in Anna precinct No. 2. His evidence did not overcome the presumption of the legality of the vote of Carl Miller, and it was error to deduct his ballot from the total of plaintiff.

Plaintiff also insists that the court erred in deducting the vote of Mose and Edith Miller from his total. The registration cards and applications for their ballots are in evidence and are shown to be regular. No challenge, either of their right to register or to vote in Stokes precinct, was made. If we correctly understand defendant's contention, adopted by the trial court, the loss of the right to vote in Stokes precinct is based upon the admitted fact that the Millers took the greater part of their household effects from Union county on March 2, 1942, to Jackson county, where they occupied a three-room house for more than two months, and about August 20, 1942, returned to Union county to reside. It is argued that by so doing they had lost their residence and right to vote in Stokes precinct, and as they had not been back in Union county ninety days prior to November 3, 1942, they had no right to vote on that day. The evidence is that Miller is a laborer, working for others for no fixed time. He moves from place to place as he gets employment. This court has, in effect, passed upon the provisions of section 2 of the act under consideration in construing section 66 of the Elections Act (Ill. Rev. Stat. 1941, chap. 46, par. 66,) which provides that "A permanent abode is necessary to constitute a residence within the meaning of the preceding section."

In *Pope* v. *Board of Election Comrs.* 370 Ill. 196, cited by defendant, the facts were that Pope, who had resided in East St. Louis, sold his home there and moved his family to a hotel in St. Louis. In denying him the right to register, this court found that he had abandoned his former home and abode as a residence from which he was entitled to register and vote, and had not established a permanent residence and abode in his office, in fact had not established a permanent residence or abode in any other precinct in the city. It was there pointed out that, to entitle a voter to registration in a voting precinct, he must

"show a place of residence or permanent abode, for the requisite statutory period in the precinct in which he seeks to register, which he has not abandoned but which he occupies as an abode, or to which he intends to return." The facts in that case are not similar to those before us. Pope sought to register in a precinct where he did not live and where he had never lived nor claimed a right to vote. He admitted he took his family from his home, in another precinct in the city, to St. Louis. It was held that he could not establish a permanent residence or abode by such conduct. In this case, the Millers had had a permanent residence in Stokes precinct for over four years prior to March 2, 1942, and had voted in this precinct. Their registration shows that their permanent abode was in Stokes precinct. There is no evidence that they had voted in any other precinct. The fact that Miller took employment in Jackson county and took his family with him is not proof of abandonment of his residence in Stokes precinct. He testified that his work in Jackson county was but temporary; that when he left he intended to return when his work was finished in Jackson county; that he took only enough furniture to fit a three-room house, and left the rest, consisting of two beds, a washing machine, radio, a number of cans, and some canned food, in Union county, with his son, and that he returned to Union county around August 28, 1942. If he had given up his residence in Union county when he went to Jackson county, he had not, after his return, resided in Union county the required ninety days. If he did not give up his residence in Union county, he was entitled to register and vote. He testified to his intention to return to Union county. That evidence is not disputed. *Park* v. *Hood,* 374 Ill. 36, *Coffey* v. *Board of Election Comrs.* 375 Ill. 385, and *Clark* v. *Quick,* 377 Ill. 424, cited by defendant, all announce the rule as stated in the *Park case,* as follows: "One does not lose a residence by temporary removal with intention to return, or even with a conditional

intention of acquiring a new residence, but when one abandons his home and takes up his residence in another county or election district, he loses his privilege of voting in the district from which he moved." The facts in the cases cited differ from the one before us as to the various votes there objected to. Here there was no dispute of the Millers' intention to return. They left a number of household goods in Union county. They cannot be said to have abandoned their residence in Union county. They were entitled to vote and it was error to deduct their votes from plaintiff's total. *Pope* v. *Board of Election Comrs.* 370 Ill. 196; *Carter* v. *Putnam,* 141 Ill. 133.

Plaintiff urges that it was error to deduct the vote of John Bishop from his total. There is no question as to his registration or right to vote. The application for ballot is marked that he voted by mail, unchallenged. Paul H. Ellis, county clerk of Union county, testified that Bishop made the requisite affidavit for an absentee ballot; that he voted the ballot in the office of the county clerk of Union county; that he, the witness, saw him mark his ballot, and that Bishop, as he marked his ballot, stated: "I'm voting it straight." Section 6 of the Absent Voters Act (Ill. Rev. Stat. 1941, chap. 46, par. 467, p. 1521,) provides for the subscribing to affidavits before an officer authorized by law to administer oaths, and "such voter shall exhibit the ballot to such officer unmarked, and shall thereupon in the presence of such officer and of no other person mark such ballot or ballots, but in such manner that such officer can not see or know how such ballot is marked, and such ballot or ballots shall then in the presence of such officer be refolded by such voter in the manner required to be folded before depositing the same in the ballot box, and be in the presence of such officer deposited in the envelope and the envelope securely sealed."

It is settled that a ballot cast outside the voting booth is illegal and where there is evidence as to how the ballot

was voted, it should be deducted from the total of the candidate voted for. (*Rhyan* v. *Johnson,* 364 Ill. 35; *Siedschlag* v. *May,* 363 Ill. 538; *Choisser* v. *York,* 211 Ill. 56.) Bishop's ballot was voted by him in the presence of the county clerk, the officer authorized to take his affidavit. This was in accordance with the statute, but the provision that the ballot should be marked "in such manner that such officer cannot see or know how such ballot is marked" was not complied with, as the county clerk testified that Bishop said: "I'm voting it straight." The clerk also testified "I saw him mark the Republican circle, he marked it in front of me." This witness stated that he did not know whether he had offered Bishop a place to vote secretly. Asked whether Bishop had an opportunity "to go in and vote properly" witness replied "Sure, all of them did." There is no dispute as to this evidence. Bishop did not testify.

In *Choisser* v. *York,* 211 Ill. 56, votes cast outside the booth were held illegal. Also the vote of one of the judges, who voted openly and publicly marked his ballot in the presence of other judges, was held illegal, this court saying: "The vote was cast in defiance of law, was an illegal ballot and should have been rejected."

In the *Siedschlag case,* a voter marked her ballot outside the booth and a witness saw how she voted. Her ballot was held illegal. Public voting is contrary to the statute requiring secrecy of the ballot. While such provisions are for the purpose of protecting the voter, they are also for the purpose of preventing his thus informing others how he voted. In that regard the purpose is not different from that lying behind the rule that ballots with distinguishing marks shall not be counted. It is argued that there is no evidence that Bishop knew that the clerk saw him mark his ballot, and that the rule in *Choisser* v. *York* should be limited to those cases where booths are provided and the voter in defiance thereof marks his ballot in public. Some

distinction is to be drawn between votes cast outside a voting place where booths are provided and one cast in the office of the county clerk having no such booths. But, as noted, the voter is required to vote "in such manner that such officer cannot see or know how such ballot is marked."

While we are of the opinion that not every case where the voter voted in the clerk's office necessarily results in the casting of an illegal ballot if some one should see him mark it, yet where, as here, the voter openly and with the evident intention of disclosing how he voted, marks his ballot so that the clerk or whoever else is standing by may see, the purpose of the statute requiring secrecy of the ballot also requires that such vote be not counted.

Apparently Bishop had an opportunity to go into another room or into a vault to mark his ballot, but chose to vote publicly and show how his ballot was marked. This was a violation of the statute and rendered his ballot invalid. It being conceded that he voted for the plaintiff, it was not error to deduct his ballot from plaintiff's total.

Plaintiff insists the court erred in not counting for him ballots marked for identification as B-2, B-4, B-14, and B-22. These ballots have been certified for our examination. B-2 is marked in the party circle by a voter whose hand was very unsteady. A microscopic examination of the markings does not disclose whether the two irregular lines actually cross or each comes into practical proximity with the other. They are, at any rate, close enough to warrant the conclusion that they touch in what appears to have been an attempt to cross them. The marking in this particular may be likened to ballots considered in *Slenker* v. *Engel,* 250 Ill. 499, and *Brents* v. *Smith,* 250 Ill. 521, where the markings somewhat resembled a T. We are of the opinion that this ballot should have been counted for plaintiff.

Ballot B-4 was the absentee ballot of Barbara Tripp of Lick Creek precinct, marked on the outside thereof, "Ob-

jected to." This ballot was not counted by the judges of election. On the contest A. C. Penninger, one of the judges of election, testified that he recognized the ballot as that of Barbara Tripp, as it bore his initials and was stamped by him: "Objected to;" that the judges decided her ballot was not a legal ballot for the reason she did not "live in the precinct any more" and that that objection to the ballot was made by Hershel Kelley, a clerk of election. He further testified that Barbara Tripp was not a resident of Lick Creek precinct but makes her home with her son part of the time and her daughter part of the time, both of whom live out of the precinct. Plaintiff urges that from the evidence it cannot be determined whether anyone actually challenged this vote and that the judges cannot question the residential qualifications of the voter. It is shown that this vote was challenged. When this occurs the judges of election have power to determine the legality of the ballot. (Ill. Rev. Stat. 1941, chap. 46, par. 471.) There is nothing to show that this voter was registered, other than the fact that she sent in an absent voter's ballot. Nor does this voter enjoy the benefit of a presumption of validity of her ballot, as such presumption applies only where the ballot has been cast. (*Gentry* v. *Reinhardt,* 350 Ill. 582.) Here the vote was challenged and the judges of election determined whether it should be cast, as they were required to do. The vote was not deposited in the ballot box. Defendant's evidence indicates that Barbara Tripp did not live in the precinct from which she sought to vote. This evidence is undisputed. In this condition of the record the court did not err in refusing to count this vote for plaintiff.

Ballot B-14 is a ballot marked in the Republican circle and is a straight Republican ballot. On the left-hand margin, under a proposal for a constitutional amendment, the word "Yes" was written in pencil and over this word are pencil marks practically obscuring the word "Yes." The

trial court held this was a distinguishing mark and refused to count it for plaintiff. The rule is settled that any deliberate marking of a ballot by a voter, not made in an attempt to indicate his choice of candidates or vote on a public proposition, and which is also effective as a mark by which a ballot may be distinguished, invalidates the ballot. (*Barlick* v. *Kunz,* 375 Ill. 318; *Stevenson* v. *Baker,* 347 Ill. 304.) It is equally well settled that if it appears that the marks were placed upon a ballot as the result of an honest effort by the voter to indicate his vote or choice of candidates or on a public proposition, and not an attempt to indicate the identity of the the voter, the ballot should not be rejected. (*Barlick* v. *Kunz,* 375 Ill. 318; *Bullman* v. *Cooper,* 362 Ill. 469; *Rexroth* v. *Schein,* 206 Ill. 80.) Whether a particular mark upon a ballot is a distinguishing mark is largely a question of fact to be determined from an inspection of the original ballot. (*Boland* v. *City of LaSalle,* 370 Ill. 387; *Bullman* v. *Cooper,* 362 Ill. 469; *Winn* v. *Blackman,* 229 Ill. 198.) Not every pencil scratch or marking on a ballot, in addition to the requisite cross, will be regarded as a distinguishing mark, even where, as here, it, obviously, was made by the voter himself. (*Barlick* v. *Kunz,* 375 Ill. 318; *Boland* v. *City of LaSalle,* 370 Ill. 387.) Inspection of ballot B-14 indicates the voter realized after he had written the word "Yes" that he had made a mistake and endeavored to obliterate that word by the pencil marks over it. Our conclusion is that the marks do not constitute a distinguishing mark voiding the ballot, and it was error to refuse to count it for plaintiff.

Ballot B-22 shows a clear intention of the voter to cast his ballot for plaintiff. The trial court held that the lines of the X were exactly on the line of the square and did not cross within the square, therefore it was not a valid vote for plaintiff, and refused to count it for him. This court has held that the lines form and bound the square, and to meet the requirements of the law the inter-

section of the cross must fall within the area formed and bounded by the lines of the square. (*Boland* v. *City of LaSalle,* 370 Ill. 387; *Allen* v. *Fuller,* 332 Ill. 304; *Sievers* v. *Hannah,* 296 Ill. 593; *Grubb* v. *Turner,* 259 Ill. 436.) This is a factual situation. The ballot is before us and from our examination thereof we conclude that the intersection of the X is not within the square and it was not error to refuse to count the same for plaintiff.

Plaintiff claims the court erred in counting ballot B-21 for defendant. This ballot is not marked in either circle. It is marked in the squares before the names of certain candidates on the Democratic ticket. In the square in front of defendant's name there was apparently placed an X, which the voter attempted to erase. He did not entirely succeed, as dim traces of the cross remain visible. The trial court held it a valid vote for defendant. In *Rexroth* v. *Schein,* 206 Ill. 80, a voter marked an X in the square opposite both the contestant's and contestee's names. An erasure in the square opposite the contestee's name indicated that he first made a cross in that square either by mistake or afterwards changed his intention. It was held that the erasure did not constitute a distinguishing mark and the cross in the square opposite the contestant's name indicated his intention to vote for the contestant and the ballot was properly so counted. In the case before us, Ballot B-21 shows by its markings that the voter did not want to vote for all the candidates on the ballot, as he placed an X in the squares opposite the names of six of the candidates, including that of defendant. No attempt was made to vote for plaintiff. The attempted erasure of the X in the square opposite defendant's name, shows a clear intention that he did not intend to vote for defendant or had changed his mind. The ruling that the ballot was a valid vote for defendant did not give effect to the voter's intention and it was error to count it for him.

Defendant has assigned cross errors, arising on the rulings of the trial court holding the Permanent Registration Act to be directory rather than mandatory, and permitting to be counted the votes of 28 voters who were not properly registered. No question is here made that all these votes were cast for plaintiff.

The Permanent Registration Act (Ill. Rev. Stat. 1941, chap. 46, par. 153.21,) permits nonregistered voters to register on election day at the polling place in the precinct where he or she is entitled to vote. The method and requirements for registration are the same as other registrations provided by the act, except that the applicant must sign an affidavit that he or she is an applicant to vote in the precinct and has not voted without registration at any prior election since the adoption of the Permanent Registration Act. The applicant must also, under oath, satisfactorily answer the questions necessary to fill out the registration card, and after it has been filled out, sign it in duplicate. That section further provides that after this is done the applicant must sign an application for a ballot and if the registration card is marked "complete" and the signatures on the application for ballot and on the duplicate registration card are found to be the signature of the same person, then, and only then, is the applicant for a ballot entitled to receive a ballot and to vote.

As hereinbefore observed, this Permanent Registration Act, as applicable to counties of under 500,000 population, is a new act, and the question whether its provisions are to be considered mandatory or directory has not been heretofore passed upon. Consideration of that question has arisen under a registration law applicable under the City Election Act. Section 10 of the Permanent Registration Act provides that: "No person shall be registered, unless he applies in person to a registration officer, * * * and executes the affidavit of registration. The registration

officer shall require each applicant for registration to read or have read to him the affidavit of registration before permitting him to execute the affidavit." Section 1 of the act provides: "Except as hereinafter provided, it shall be unlawful for any person * * * to vote at any primary, general or special election * * * unless such person is at the time of such election a registered voter under the provisions of this Act." It is clear from these and other like provisions of the act, that it was the intention of the General Assembly to make mandatory those provisions prescribing the acts necessary to be performed by the voter. It is argued that every voter has a right to express his will at the polls and the inference is that in order to accomplish this a certain amount of leeway should be permitted in the matter of his registration.

A right to vote is not an inalienable right. It is a conditional right, conditioned upon many things, among which are not only the requirement that he be properly registered as a voter, but that he appear at the proper hours for voting and that he vote only in his own precinct, and the like. (*Clark* v. *Quick,* 377 Ill. 424.) The general rule in determining whether a statute is mandatory or advisory is as follows: "Where the terms of a statute are peremptory and exclusive, where no discretion is reposed or where penalties are provided for its violation, the provisions of the act must be regarded as mandatory." (*Clark* v. *Quick,* 377 Ill. 424; *Siedschlag* v. *May,* 363 Ill. 538; *Allen* v. *Fuller,* 332 Ill. 304; *People* v. *Bushu,* 288 Ill. 277; *Behrensmeyer* v. *Kreitz,* 135 Ill. 591.) It is clear that no discretion is reposed in the voter by the language of the Permanent Registration Act as to the necessity for his registration in the manner required by the act. It was the evident intention of the General Assembly to put teeth into the Permanent Registration Act and to prevent frauds arising out of illegal or indifferent registration.

As hereinbefore stated, the rule governing the action of election officials having to do with the counting, care and preservation of ballots is as stated in *Sibley* v. *Staiger,* 347 Ill. 288, citing *Allen* v. *Fuller,* 332 Ill. 304, and *People* v. *Bushu,* 288 Ill. 277: "While it is a rule that mistakes or omissions of the officers in charge of an election will not defeat the plainly expressed will of the voters, yet the rule does not apply where the officers have failed to perform mandatory duties of a precautionary character which safeguard the votes of the electors." Reasons for considering, as mandatory or directory, duties resting upon registration officials do not lie in quite the same category. After ballots are marked and cast, it is generally impossible to determine who voted them. In fact, such is the purpose of the statute requiring secrecy of the ballot. That situation does not exist so far as registration is concerned, but the statute gives opportunity for correction of registrations. We are, therefore, of the opinion that mistakes made by election officials as to registration do not fall into the same category as mistakes affecting the precautionary character of duties to safeguard the votes of electors. The law presumes that officials will do their duty and if mistakes are made in registration, opportunities to correct them are afforded by the statute. So far as the voter is concerned, however, if he would exercise the privilege of voting, the provisions of the statute concerning what he shall do to register are in our opinion mandatory. *People ex rel. Grinnell* v. *Hoffman,* 116 Ill. 587.

Referring now to defendant's cross errors as to certain ballots cast in Anna No. 1 precinct, counted by the court for plaintiff and as to which the voters registered at the polls on election day, we find that the record shows from the exhibits that Sallie Reese, Callie Hood, Mary E. Baggott and Edna T. Gordon each signed and swore to, before a judge of election, the required affidavit for registration, each signed a registration card, which was marked

"complete," and also signed an application for a ballot, duly filled out and in regular form. We find nothing irregular in the record of their registry and the trial court did not err in refusing to deduct their votes from plaintiff's total.

As to the ballots of Katie Maloney and Duane Fox in Anna No. 2 precinct, also registering at the polls on election day, we find that each properly filled out the registration and application blanks and in every way complied with the requirements of the statute, but that no judge of election signed the *jurat* on the affidavit required. From the fact that all steps necessary to be taken by the voter were complied with, coupled with the facts that a ballot was delivered to each as a duly registered voter, and that each voted, it will be presumed that the judge of election whose duty it was to swear the applicant, had performed his duty, and the fact that no *jurat* was signed by a judge cannot be said to overcome the record and the presumption arising therefrom. The signing of the *jurat* to the affidavit was but a ministerial act of the judge, and the failure to perform that duty, after the voter had fully complied with the requirements of the law as to his registration, cannot make void a ballot which the voter had cast without challenge. The trial court did not err in refusing to deduct these two votes from plaintiff's total.

The remaining 22 ballots objected to by defendant's cross errors will be considered together. In each case an attempt was made to register at the polls on election day. The record shows that the voters either did not sign the required affidavit or did not complete their registration card. They, therefore, were not entitled to vote. The presumption of validity of their votes, arising from the fact that they were deposited in the ballot box, was overcome by the proof of the registration record each made, showing they had not legally registered. It is not denied that they

all voted for plaintiff. These 22 votes should have been deducted from plaintiff's total.

Defendant also assigns as cross error the counting of ballot B-8 for plaintiff. This ballot was marked with an X in the circle at the head of the Democratic ticket. Defendant's name was scratched out by drawing lead-pencil lines over it and plaintiff's name written below that of defendant. No square with a cross therein was put in front of the name of plaintiff as written in. The trial court counted this ballot for plaintiff. It is marked in a manner somewhat similar to one of the ballots in *Winn* v. *Blackman,* 229 Ill. 198, which this court held valid, the difference being that an X was put in the square opposite the name of the candidate erased in the *Winn case.* In *Pierce* v. *People ex rel. Field,* 197 Ill. 432, where the name of a candidate was written in a blank space for alderman on a ticket which did not contain the name of a candidate for that office and no cross was put in the square before his name, though a cross was placed in the circle at the head of the ticket, it was held that the vote should be counted for the candidate whose name was written in. In *Smith* v. *Reid,* 223 Ill. 493, it was held that writing in names on a ticket did not render the vote illegal, though the names so written in appeared in other places on the ballot as candidates for the same offices. In the *Pierce case* it is pointed out that the purpose of the election law is to record the will of the voter, and where he is honestly attempting to comply with the act, as in the case cited, his vote will be counted unless to do so would violate some provision of the election law.

Defendant insists that the reasoning of the *Winn case* was overruled in *People ex rel. Schnackenberg* v. *Czarnecki,* 256 Ill. 320, and *People ex rel. McCormick* v. *Czarnecki,* 266 Ill. 372. Those cases had to do solely with the right of a candidate for office to have his name printed on the

ballot as a candidate of more than one party for the same office. It was not error to count ballot B-8 for plaintiff.

Defendant's next cross error is that the trial court erred in not deducting the votes of Asa Linton and Christy Linton from the total vote of plaintiff. This contention is based upon the fact that while those voters' names appeared upon the printed precinct register of voters, as being registered voters in Alto Pass precinct, their registration cards could not be found. Each signed an application for a ballot but failed to execute the affidavit required by section 21½ of the act, and it is contended that, therefore, their votes were illegal.

Section 21½ of the act, (Ill. Rev. Stat. 1941, chap. 46, par. 153.22, p. 1429,) in the last paragraph, provides that where an elector makes application to vote by signing and presenting the necessary application, and his registration card is not found in the precinct registry of voters, but his name appears as that of a registered voter in such precinct upon the printed precinct register or upon the consolidated list, not erased, such shall be *prima facie* evidence of the elector's right to vote, upon compliance with the remaining provision of that paragraph. This provision is that a judge of election shall require an affidavit by such person and by two householders residing in said precinct, that he is the same person whose name appears upon the printed precinct register as corrected or revised, and that he resides in the precinct, stating the place of his residence, and upon presentation of such certificate and affidavits he shall be allowed to vote. It is clear that the meaning and intent of that provision is to give a registered voter, whose registration card, through no fault of his, is not in the precinct registry of voters, the right to vote upon making proof that he is the same person whose registry card cannot be found and that he is a resident of said precinct.

In the case under consideration, Christy and Asa Linton made out their *prima facie* case, and in support thereof the

necessary affidavits were filled out, but apparently through inadvertence the name "Edna Sitter" appears as signing the affidavits. Two householders signed the necessary affidavits on each application, which identified the Lintons as the same persons whose names appeared on the printed registry record and that each of them lived in that precinct. Defendant offered no proof to dispute these affidavits and does not contend here that the Lintons were not legal voters in that precinct. Here the voters were *prima facie* legally registered voters, and we are of the opinion that the error in making their affidavit does not overcome, in such a case, their *prima facie* right to vote as registered voters, and it was not error to refuse to deduct their votes from the total cast for plaintiff.

Defendant next urges, in support of cross errors, that the court erred in not deducting 13 votes from plaintiff's total votes on the ground that such voters were assisted in voting without making the affidavit required by the act. The registration card of Sam Dallas, one of the 13, shows he registered September 19, 1942, and that his registration was complete. His application for a ballot was regularly filled out and signed and there is no notation thereon that he received assistance. No claim is made that his right to vote was challenged. His right to vote was complete and it was not error to refuse to deduct his ballot from plaintiff's total. Of the remaining twelve objected to, the record shows that each of them registered either on September 19, 1942, or October 3, 1942, and that their respective registrations were complete. Each signed a regular application for ballot. Defendant does not question their right to vote but contends that because their application for ballot shows a check mark indicating that each received assistance and no affidavits were made by them, their votes were illegal. Adam J. Cauble, a judge of election in that precinct, testified for defendant that a number of people asked for and received assistance in voting that

day, and that none of them filled out an affidavit while he was there. There is no further evidence touching the matter. The record does not disclose whether any such affidavits were returned by the election officials. There is no evidence that these voters asked for assistance other than the check mark appearing on their application for ballot. The judge of election who checked the applications of these voters for ballots was not called as a witness. The judge who was called did not remember that any of these voters asked assistance. In this condition of the record we are of the opinion that the registration and voting without challenge raised a presumption of the legality of their ballots. The presumption is that the judges of election performed their duty. We agree with the finding of the trial court that defendant did not, by competent evidence, overcome the presumption of validity of the ballots of those voters. It was not error to refuse to deduct these twelve votes from plaintiff's total.

Defendant's last cross error is that the court erred in not deducting the vote of Eleanor Taylor from plaintiff's total. Her registration card shows she was regularly registered October 6, 1942, and that her registration was complete. Her application for ballot is regular and shows she voted by mail. There is nothing to indicate that her ballot or right to vote was challenged, hence her right to vote was clearly established unless defendant by competent evidence showed that, as he claims, she did not have a right to register when or where she did. The evidence to overcome the record of her right to vote was the testimony of a Mrs. James Lutz, who testified that Eleanor Taylor moved from a house owned by the witness, in Anna, sometime in the summer of 1942, and that she heard she moved to St. Louis, and the testimony of Jean Henderson, whom the records show was a registration officer, who testified she was present when Eleanor Taylor registered, that she gave her address as East Davie St., Anna, and that it was the witness's impression that she stated that she lived in

St. Louis. No reason is given why, if such statement was made, she was permitted to register. Her registration affidavit shows she lived at 115 Lafayette St. in Anna. It can scarcely be said that incompetent impressions of witnesses as to the voter's statement, or hearsay evidence as to where she lived, can be considered as overcoming her affidavit. The Permanent Registration Act makes provision for a challenge not only of the right to register, but of the right to receive a ballot. These opportunities were not accepted. The evidence in the record is not sufficient to overcome the presumption of validity of her ballot, and it was not error to refuse to deduct her ballot from plaintiff's total.

A summary of the legal votes is as follows: Plaintiff's total vote as found by the trial court was 3378. Adding thereto the votes of Luther Morse, Willis Wilson, Thomas Morse, Earl Halterman, Mary Halterman, Jennie Ralls, William E. Ralls, Manuel Smith, Mary O. Smith, Benjamin Morris, Rosa B. Morris, Carl Miller, Norma Bauer, Mose Miller, Edith Miller, and ballots B-2 and B-14, a total of 17 votes not counted for him by the trial court, results in a total of 3395 for plaintiff. Deducting therefrom the 75 votes counted for him in Cobden No. 2 precinct and the 22 votes as to which cross errors were sustained, or a total deduction of 97, leaves plaintiff with a net total of 3298 votes.

Defendant's total vote, as found by the trial court, was 3385. From these are to be deducted 89 votes in Cobden No. 2 precinct and Ballot B-21, making a total of 90 votes deducted, leaving for defendant a net total of 3295 votes. The result is the election of plaintiff by a majority of three votes.

The judgment of the circuit court is reversed and the cause remanded to that court, with directions to enter a judgment declaring appellant elected to the office of county judge of Union county.

*Reversed and remanded, with directions.*